**UNITED STATES of America,
Appellant,**

v.

**Jon Cary MAIER, Appellee.**

No. 82-1218.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 13, 1982.

Decided Oct. 27, 1982.

Rehearing Denied Dec. 7, 1982.

Marc G. Kurzman, Kurzman, Shapiro, Manahan & Partridge, Minneapolis, Minn., for appellee.

James M. Rosenbaum, U. S. Atty., Daniel W. Schermer, Asst. U. S. Atty., D. Minn., Minneapolis, Minn., for appellant.

Before LAY, Chief Judge, and BRIGHT and JOHN R. GIBSON, Circuit Judges.

BRIGHT, Circuit Judge.

The United States appeals from the grant of a motion by defendant-appellee Jon Cary Maier to suppress as evidence seven bales of marijuana and related materials seized by police during the search of the camper portion of a 1980 Chevrolet pickup truck and "topper" camper unit. The grand jury charged Maier with possession with intent to distribute approximately 190 pounds of marijuana, in violation of 21 U.S.C. § 841 (1976). Prior to trial, Maier moved to suppress the evidence on the grounds that it had been obtained by an unlawful search and seizure. A United States Magistrate recommended that the motion be granted. The district court adopted the magistrate's report in substance and entered an order of suppression. The Government appeals under 18 U.S.C. § 3731 (1976).

We reverse, and hold that the police discovered the marijuana while making a valid inventory of the contents of the vehicle, including the camper. Thus, the search and subsequent seizure of the items in question did not violate the defendant's rights under the fourth amendment.

I. *Background.*

At approximately 2:00 a.m., September 10, 1981, Minneapolis police officers Rognlie and Carey responded to a call to check a vehicle parked on a Minneapolis street. Upon arrival at the location of the vehicle, the officers found Maier asleep in the driver's seat of the pickup with his feet sticking out of the window on the driver's side of the truck. The truck was parked with its right front and right rear wheels on the sidewalk. In response to police questioning, Maier gave his name and date of birth, but stated that he carried no identification. The officers then ran a driver's license check and a warrant check, and learned that Maier had no warrants against him but that his driver's license had been suspended. Because of the license suspension, the police officers informed Maier he would not be allowed to drive the vehicle away, and that it would be towed. The officers then took possession of the keys to the vehicle and directed Maier to depart on foot.

One of the officers then began to prepare an impound report while the other officer inspected the contents of the cab as part of "normal police procedure to inventory any valuable contents in the vehicle." The officer inspecting the cab, Officer Rognlie, observed a large leather bag in the front seat of the vehicle. At that time he called to Mr. Maier, who was about fifty-to-one hundred feet away, and inquired whether Maier owned the bag. Maier responded negatively. After Officer Rognlie moved the bag, he then found a second bag, which he described as a bank pouch, with a large number of $100 and $50 bills inside (a later count disclosed approximately $14,000 in currency). Officer Rognlie then ran after Maier and overtook him a block or so from the location of the truck. Rognlie later testified that when he caught up with Maier, he thought Maier was attempting to hide behind a wood fence. He asked Maier to whom the bag of money belonged, and Maier denied any knowledge of it. Maier stated that a friend, Mr. Wenzell, owned the truck but that Maier had been using it for the past five months. Rognlie then asked Maier to return with him to the truck.

The officers next proceeded to look into and unlock the rear "topper" of the camper portion of the truck. They observed several sleeping bags and a large sheet of plywood about eighteen inches above the floor that blocked further view of the camper floor. One of the officers testified that upon opening the "topper", he detected the smell of what he believed to be unburned marijuana, although he could not, in testimony, describe the smell or articulate why he identified the odor as that of marijuana. One of the police officers then lowered the tailgate of the camper. Inside he saw a number of sealed opaque garbage bags visible under the plywood board. Officer Rognlie squeezed one of the garbage bags and felt its contents but did not open the bag.

The officers returned to their squad car and advised Maier that he was under arrest for "probable cause, narcotics." The police at the scene placed a radio call for a narcot-

ics investigator. After his arrival, the investigator prepared an affidavit in support of an application for a search warrant based solely on the information supplied by the policeman first on the scene. The police arranged to tow the truck to the police garage and there seized under the warrant approximately 190 pounds of marijuana located in the camper.

At the suppression hearing, Officer Rognlie testified that he had initiated the search of the pickup truck as an inventory search pursuant to normal police procedures used when impounding a vehicle. He testified further that he and his partner decided to impound the vehicle because Maier's driver's license had been suspended and no other person responsible for the vehicle was in the area. In addition, the prosecutor produced testimony from a police sergeant from the Minneapolis Police Department, who explained:

> Briefly, if a vehicle is found to be in violation and subject to tow, the vehicle will be searched in its entirety including any compartments or storage areas of the vehicle and towed. Failing to undertake such a search is a violation of department procedure and subjects are subject up to five days off without pay.

Finally, Officer Rognlie testified that he had opened the camper for self-protection, and to avoid the possibility of being shot by someone in the camper. Rognlie stated that he was aware that one week earlier a policeman had been shot by a man hiding in the back of a pickup truck.

In recommending that the motion to suppress be granted, the magistrate made findings, among others, that the fear for safety expressed by Officer Rognlie "was not reasonable in light of the circumstances," and further, that the officers' belief that they detected the smell of unburned marijuana was also not reasonable.

In adopting the magistrate's findings and opinion, the district court expressed the view that *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1967), would permit the inventory search of the locked portion of a motor vehicle. Nevertheless, the district court believed that this court's opinion in *United States v. Wilson,* 636 F.2d 1161 (8th Cir. 1980), required a determination that police had made an unlawful search and that the unlawful search tainted the warrant. We disagree. Upon careful review of the record, we believe the facts here are quite different than those presented in *Wilson,* and justify approving the search under *Opperman.*

II. *Discussion.*

The issue in this case focuses on whether the police had a right to extend an inventory search into the locked camper portion of the pickup truck unit. The Government contends the inventory search exception to the warrant requirement as discussed in *South Dakota v. Opperman, supra,* justified a cursory search of the truck unit including the locked portion of the camper.[1]

The Supreme Court in *Opperman* indicated that once a vehicle is seized and legitimately taken into police custody, the routine practice of securing and inventorying its contents is justified as serving three distinct needs:

> [T]he protection of the owner's property while it remains in police custody * * *; the protection of the police against claims or disputes over lost or stolen property * * *; and the protection of the police from potential danger * * *. [428 U.S. at 369, 96 S.Ct. at 3097.]

The search in *Opperman,* however, extended only to the interior and unlocked glove compartment of the car.

In *United States v. Wilson,* 636 F.2d 1161 (8th Cir. 1980), we held that a legitimate seizure does not automatically justify an

1. The Government in its brief argues that the camper was not locked and that the inventory search in question here extended to an unlocked portion of the vehicle. The magistrate's findings, as well as the evidence, however, militate against that assertion.

Notwithstanding the efforts of the Government to sustain the search on several invalid grounds, we are satisfied from our examination of the record that the police entered the locked camper while conducting an appropriate inventory search.

unlimited search of an automobile, and that the search must still be reasonable in light of the facts and circumstances of the particular case. 636 F.2d at 1163. In *Wilson,* police arrested the defendant for committing certain traffic violations. Because he was a nonresident, the officers took Wilson to the police station to post an appearance bond. Although they later determined that Wilson had not been intoxicated, the officers testified that they had his car towed because they believed he was not capable of driving it himself. Before it was towed, the officers searched both the interior and locked trunk of the car, where they found incriminating evidence.

This court held that under the circumstances, the warrantless entry by police into the trunk was unjustified and unlawful. We stated that

> the search was unreasonable in light of the individual's greater expectation of privacy in the locked trunk of *his* automobile and *in view of the particular facts of this case.* [636 F.2d at 1163 (emphasis added).]

We also noted that

> [a]lthough an individual may not reasonably expect the same degree of privacy in

a car trunk as in a home or office, an individual may justifiably have a greater expectation of privacy in the locked trunk than in the interior of his car. [636 F.2d at 1164.]

In *Wilson,* the owner of the car was present but given no opportunity to arrange for the safekeeping of his belongings, to consent to the search, or to relieve the police from liability. This court observed that the inventory search in *Wilson,* unlike the search in *Opperman,* was not "prompted by the presence in plain view of a number of valuables inside the car." 636 F.2d at 1165 (*citing United States v. Opperman, supra,* 428 U.S. at 375–76, 96 S.Ct. at 3100). We also held that the search itself was unnecessary because the police intended to retain control of Wilson's vehicle for only a short period of time until Wilson could post an appearance bond. 636 F.2d at 1166.

Here, the police legitimately seized the pickup-camper in question. It was parked illegally in the early hours of the morning. Maier was alone without a valid driver's license, and no responsible person was available to remove the truck from the sidewalk.[2]

---

2. Although Maier argues that the police did not comply with requirements of the Minneapolis ordinances for an inventory search, and the magistrate made findings consistent with Maier's contention, we disagree with that conclusion. From our examination of the record, the undisputed facts demonstrate the police directed the impoundment of the vehicle and were in the process of preparing an impoundment inventory when one of the officers discovered $14,000 in currency. Police Officer Rognlie testified:

> A  The party was asked to get out of the cab of the truck, and we told him that because his license was under suspension, we were not going to let him drive the vehicle away. It would be towed. I removed the keys from the ignition of the truck, taking off the keys to the truck and handing him back his keys so he could get into his house or apartment or whatever he was in.
> Q  Okay. What happened after that?
> A  He jumped back in the truck, and he began looking for his keys on the ring, and I told him I had the keys to the pickup truck, and he was not going to be able to drive the truck away, and he better start walking or find some transportation to get himself

home, as he was not going to be able to take the truck home with him.
> Q  What was the reason for that?
> A  Under suspension. No one else in the vehicle that I could see in the cab, and we couldn't let him drive it away while he was under suspension.
> Q  Under suspension. You mean his driver's license was suspended?
> A  That's right.
> Q  What happened after that?
> A  Finally the party got out of the truck and started walking eastbound on 46th Street, and I yelled to my partner who was in the truck to start the tow-sheet or impound report, and I went up to the cab of the truck to look over the contents of the cab which is normal police procedure to inventory any valuable contents in the vehicle.
> Q  Also a normal police procedure, is there a requirement of the police department to do this?
> A  Yes, sir. In our manual it's required.
> Q  Okay. Do you know why you have this impound procedure?
> A  Well, the towing by the City of Minneapolis is done by two different towing companies that are under contract, and they park

After the police officers began the inventory search of the cab of the pickup, one of the policemen discovered a large amount of currency in the cab. The officer investigated further and learned that Maier did not own the truck and denied any interest in the large sum of money discovered in the cab. An officer looked through the rear window of the camper and observed other items of personal property in the camper area.

Here, unlike *Wilson,* no reason existed to limit the inventory search to the passenger area of the vehicle. After discovering the large amount of money in the cab, and in light of the absence of the owner, the need under *Opperman* for a reasonable police procedure for "protection of the owner's property" justified police in examining and making an inventory of the entire vehicle, including the locked camper, to assure that any other valuable property would be recorded and kept safe.

A police officer is justified in assuming that valuable items of personal property are stored in the camper unit of a vehicle impounded by the police when the officer finds $14,000 in currency in a pouch on the front seat of the vehicle and can see through a window that the camper unit contains some items of personal property. An inventory search of a locked camper unit under such circumstances is therefore proper. A police officer continues to act reasonably, moreover, when, after becoming suspicious of the possible illegal nature of the contents of the camper during the inventory search, he stops his search and initiates procedures leading to the issuance of a proper search warrant.

Accordingly, we reverse and remand for further proceedings.

vehicles in different areas, and the contents may sometimes turn up missing, and that's why we inventory them for—basically for safekeeping so it's noted on the sheet that it was there.

Thus, the record demonstrates that the initiation of the search into the vehicle was in conformity with the usual practice for inventory searches of a vehicle to be impounded.