**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Charles E. GRIFFIN and Jerome
Griffin, Defendants-Appellees.**

No. 83–1523.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 27, 1983.

Decided Feb. 28, 1984.

As Amended Feb. 29, 1984.

Rehearing Denied April 13, 1984.

David H. Miller, Asst. U.S. Atty., Fort Wayne, Ind., for plaintiff-appellant.

Joseph W. Ruppert, Bowman, Crowell & Teeters, Fort Wayne, Ind., for defendants-appellees.

Before BAUER, ESCHBACH and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

The Government appeals the order of the United States District Court for the Northern District of Indiana, granting defendants' Motion to Suppress the introduction into evidence of 805 grams of phencycledine. We reverse.

I

The evidence at the motion to suppress hearing revealed that on December 2, 1982, at approximately 5:30 p.m., Indiana State Trooper Zimmerman spotted a speeding 1982 Corvette on the Indiana Toll Road. Zimmerman, whose roof-mounted lights were not functioning, motioned the driver to pull off the roadway by shining a spotlight on the rear window of the vehicle, but the driver responded by speeding away. Zimmerman radioed a general description of the Corvette to other officers in the area, but was unable to provide a license number as the license plates were too dirty to discern. Soon thereafter, a toll road attendant radioed that a silver Corvette, answering Officer Zimmerman's description, had exited the Indiana Toll Road at the Middleberry exit. Approximately one-half hour later the attendant radioed that the same vehicle had returned to the toll road but that the license plates remained unidentifiable. After hearing the attendant's description of the Corvette over his police radio, Indiana State Trooper Kensil radioed officers in the area that three months earlier he had stopped a silver Corvette traveling 134 m.p.h. on the Indiana Toll Road. Kensil supplied the officers with the California license number of the vehicle he had stopped and identified the driver as a Charles Griffin of Gary, Indiana.

Indiana State Trooper Hostetter, who was monitoring his radio and patrolling the Indiana Toll Road on the evening of December 2, 1982, positioned himself in the emergency lane of the roadway in order to observe the oncoming Corvette. As the vehicle passed the squad car's position, Hostetter pulled onto the roadway and followed the Corvette but was unable to determine the license number due to the dirty license plates. Concerned that this Corvette might be the same one that had previously eluded Officer Zimmerman, Hostetter continued to follow closely. Once the Corvette approached the proximity of other state troopers positioned along the roadway, Hostetter flashed his roof-mounted lights and the driver of the Corvette pulled into the emergency lane of the toll road.

Officer Hostetter approached the Corvette and informed the driver that he had been stopped for an "improperly displayed registration" (unidentifiable license plate). Hostetter asked the driver for his operator's license and vehicle registration but the driver was unable to produce either document. Hostetter then asked for any form of identification and the driver handed Hostetter an "Illinois identification card" with the name Jerome Griffin inscribed thereon. Hostetter instructed Jerome Griffin to exit the 1982 Corvette and join him in the squad car, and while there, Jerome stated that he had no valid Illinois driver's license, only an expired California driver's license. Hostetter advised Jerome that he would receive a warning for the improperly displayed registration but that he would be cited for failing to possess a valid operator's license. When informed that the fine for operating an automobile without a valid license was between $40.00 and $50.00, Jerome asked for and was given permission to borrow the money needed to pay his fine from his cousin Charles Griffin, the passenger.

During the period that Hostetter was questioning Jerome Griffin, Officer Nufer observed that the 1982 silver Corvette had a California license number identical to that of the Corvette stopped by Officer Kensil some three months earlier on the Indiana Toll Road. When the passenger of the vehicle presented Nufer with a valid Indiana driver's license in the name of Charles Griffin, Nufer identified Charles as the driver of the Corvette that had been ticket-

ed three months earlier for travelling 134 m.p.h. on the Indiana Toll Road. Nufer ran a routine check on Charles Griffin in Lake County, Indiana, Charles's county of residence, and learned that an outstanding bench warrant existed for Charles's failure to appear in court on October 8, 1982, for an unrelated traffic violation. Based upon this information, Nufer arrested Charles Griffin and placed him in custody.

Jerome Griffin obtained the cash needed to pay his fine from Charles, and then informed Charles that the Indiana State Police were going to impound the Corvette because neither Jerome, who had no valid driver's license, nor Charles, who was under arrest, could lawfully remove the vehicle from the toll road. Charles objected and suggested that the vehicle remain parked in the emergency lane of the roadway until Charles's girlfriend arrived to drive it back to Gary, Indiana.[1] Officer Hostetter refused to leave the automobile on the side of the well-traveled Indiana Toll Road due to the danger it presented to passing nighttime motorists and the high incidence of theft inherent in a late model sports car such as a 1982 Corvette. Hostetter also recalled a previous incident wherein an officer allowed alleged friends of a driver to remove the driver's automobile from the highway and the friends decided to steal the automobile. Rather than expose himself or the Indiana State Police Department to unwarranted liability, by allowing an unknown third party to remove a vehicle whose ownership had not yet been determined,[2] Hostetter followed the "standard operating procedure" of the Indiana State Police Department and impounded the vehicle.

Hostetter directed Jerome Griffin to lock the Corvette and the two of them proceeded to the courthouse in Fremont, Indiana, while Nufer began his portion of the westbound relay of Charles Griffin to Lake County, Indiana.[3] In the Fremont court, Jerome pleaded guilty to the charge of failing to possess a valid operator's license and paid the statutory fine and costs. During Jerome's court appearance, Roger Fulton arrived at the courthouse in response to Hostetter's request that the towing service provide a driver to remove the Corvette from the Indiana Toll Road. It was standard procedure to allow the towing service to drive a Corvette, rather than tow it, due to the possibility that towing might damage the sports car's transmission and/or fiberglass body.[4]

Before driving Fulton to the location of the Corvette, Hostetter offered to arrange for a westbound bus to transport Jerome Griffin back to Gary, Indiana. Jerome accepted the offer but requested permission to accompany Hostetter and Fulton to the Corvette in order that he might retrieve his apartment keys. During the trip from the courthouse to the Corvette, Jerome gave his automobile keys to Fulton pursuant to Hostetter's instructions. When the three of them arrived at the vehicle, Fulton unlocked the driver's door and allowed Jerome to search for his apartment keys. Officer Hostetter next instructed Jerome to unlock the passenger's door so that Hostetter could assist Jerome in his search for the keys and begin the routine inventory search of the vehicle.[5] While checking for

---

1. According to the district court's findings of fact, "even if Charles Griffin's girlfriend left immediately it would take over four hours to reach the site of the Corvette."

2. According to the district court's findings of fact, "[a]lthough the name of the actual owner, Cleota Griffin, may have been confirmed, his exact relationship to Jerome and Charles Griffin was not" established until the motion to suppress hearing, some four months after the incident in question.

3. Officer Hostetter testified that Charles Griffin was "relayed" to Lake County, Indiana. This

simply means that the Indiana State troopers transported Charles Griffin, within their respective areas of patrol duty, from one westbound police car to another until the final vehicle arrived in Lake County, Indiana.

4. According to the district court's findings of fact, this procedure "protected the interest of the troopers, the tow service, and the owner of the Corvette."

5. According to the district court's findings of fact, "it was standard practice for state troopers to routinely undertake the inventory of such

the presence of valuables, Hostetter reached into the open area behind the passenger's seat of the two-seat vehicle and removed the lid from an unlocked storage compartment. Hostetter observed two hand guns within the compartment and replaced the storage lid. Hostetter next searched the elasticized map pouch in the passenger door, found Jerome's apartment keys therein, and returned the same to Jerome.

Following the discovery of Jerome's keys, Hostetter checked the revolvers to determine if they were loaded. He observed that ammunition clips were in the weapons and also that an unsecured brown paper bag was lying beneath the two revolvers in the unlocked storage compartment. Hostetter removed the unsecured brown paper bag from the compartment and immediately detected an unusual odor emanating from the bag. Hostetter opened the unsecured brown paper bag, and within the bag discovered a package wrapped in brown paper and secured with fibrous plastic tape. Rather than opening the package at that time, Hostetter placed the package back inside the brown paper bag, returned the bag and the revolvers to the compartment, and instructed Fulton to drive the Corvette to a maintenance area located "about two miles" down the highway. Jerome Griffin joined Hostetter in the police car and the two of them followed Fulton to the maintenance area that also served as a gasoline service station for the Indiana State Police Department.

Once at the maintenance area, Hostetter ran a routine check on the two revolvers with his command post but received no information on either revolver. As Hostetter continued to inventory and secure the items contained within the Corvette, he removed the unsecured brown paper bag from the storage compartment and became "suspicious" of its contents. Hostetter had no knowledge of what the brown paper bag contained but decided that for purposes of his inventory, he must itemize the bag's

contents as he was "responsible for what [was] in it." Hostetter removed the tape wrapped package from the brown paper bag and opened an end portion, unsecured by tape, "to see what was in it to put down on [his] inventory." Hostetter observed a yellow substance in a clear plastic bag but did not open the plastic bag, instead he radioed Officer Nufer to join him at the maintenance area. Nufer, who had completed his portion of the westbound relay of Charles Griffin to Lake County, Indiana, arrived at the maintenance area and after observing the yellow substance contained within the sealed, clear plastic bag, informed Hostetter that he believed the package contained a controlled substance. The Indiana State Police lab later analyzed the contents of this clear plastic bag and identified the yellow substance as 805 grams of phencycledine, a Schedule II controlled substance.

On December 3, 1982, Charles and Jerome Griffin were charged with unlawful possession with the intent to distribute 805 grams of phencycledine in violation of 21 U.S.C. § 841(a)(1) (1982). The defendants moved to suppress the introduction of the phencycledine into evidence on the grounds that it was obtained without a valid search warrant. The district court granted defendants' pre-trial Motion to Suppress, ruling that the warrantless search did not fall within any of the recognized exceptions to the warrant requirement, including a search incident to an arrest, an automobile inventory, the automobile exception, or plain view, and therefore, was invalid. The sole issue on appeal is whether the district court erred in finding that the warrantless search of the 1982 Corvette did not constitute a proper automobile inventory search.

## II

In reviewing the district court's ruling that Officer Hostetter's search of the impounded 1982 Corvette did not constitute a proper automobile inventory search, we initially note the district court's finding that:

vehicles pursuant to a departmental policy which required that all impounded vehicles be

searched prior to being towed or driven away by the towing service."

"[C]redible testimony established that Trooper Hostetter took custody of an expensive sports car which would have been otherwise left unattended, possibly for an extended period, in close proximity to the traveled portion of a busy, high speed roadway. There was also a danger to other motorists, along with the need to protect the state from civil liability based upon unfounded property claims for lost or stolen items. Adopting these determinations, *the court must conclude that Hostetter's [impoundment] was justified and that based on these considerations, substantially similar to those underlying the premise in [South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976)], the initiation of the subsequent routine inventory search was reasonable and therefore consistent with the constitutional commands and guarantees of the Fourth Amendment.* 428 U.S. at 368–71 [96 S.Ct. at 3096–98]." (footnote omitted) (emphasis added).

The evidence presented at the motion to suppress hearing, and the case law applicable thereto, provides more than ample support for the district court's findings that Indiana State Trooper Hostetter's impoundment of the 1982 Corvette was proper and that his initiation of a routine inventory search, without a warrant, was reasonable and thus consistent with the Fourth Amendment.

■ The record reveals that Charles and Jerome Griffin at no time presented Officer Hostetter with documentary proof of ownership of the 1982 Corvette. In addition, the driver of the 1982 Corvette, Jerome Griffin, had no valid driver's license, and the passenger, Charles Griffin, was under arrest and being transported back to Lake County, Indiana, to answer for an outstanding bench warrant. Thus, neither Charles nor Jerome could lawfully remove the vehicle from its parked position in the emergency lane of the Indiana Toll Road. In such a situation, Officer Hostetter's decision to direct the removal of the Corvette

from the heavily traveled, high speed roadway was an act of good judgment in the interest of public safety, as the vehicle presented a hazard to passing nighttime motorists. *See, e.g., South Dakota v. Opperman*, 428 U.S. 364, 368–69, 96 S.Ct. 3092, 3096–97, 49 L.Ed.2d 1000 (1976) ("*Opperman*"); *Cady v. Dombrowski*, 413 U.S. 433, 443, 93 S.Ct. 2523, 2529, 37 L.Ed.2d 706 (1973) ("*Cady*"). Furthermore, by removing the Corvette from the roadway, Hostetter protected the expensive 1982 sports car and its contents from the likelihood of damage, theft, and vandalism. *See, e.g., United States v. Staller*, 616 F.2d 1284, 1290 (5th Cir.), *cert. denied*, 449 U.S. 869, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980); *United States v. Balanow*, 528 F.2d 923, 924 (7th Cir.1976). The impounding of the vehicle was part of Officer Hostetter's "community caretaking function[ ], totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441, 93 S.Ct. at 2528. Indeed the impounding of an automobile has been upheld as proper when the automobile is in violation of a parking ordinance, *see Opperman*, 428 U.S. at 365–66, 96 S.Ct. at 3095–96; a state forfeiture statute applies, *see Cooper v. California*, 386 U.S. 58, 61, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967); the driver is incapacitated, *see Cady*, 413 U.S. at 436, 93 S.Ct. at 2525; the driver's operator's license is suspended, *see United States v. Balanow*, 528 F.2d at 924. In this instance, the Corvette presented a potential hazard to passing nighttime motorists and neither Charles nor Jerome Griffin could lawfully remove the vehicle from its illegally parked position in the emergency lane of the Indiana Toll Road. Officer Hostetter's decision to impound the 1982 sports car was certainly proper for "[t]he authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *Opperman*, 428 U.S. at 369, 96 S.Ct. at 3097. *See also* Ind.Code § 9–4–1–113 (1976).[6]

---

6. Ind.Code § 9–4–1–113 provides in pertinent part:

■ Before removing the vehicle from the heavily traveled toll road, Hostetter commenced a warrantless inventory search of the vehicle's interior. The fact that Hostetter obtained no search warrant before initiating the automobile inventory search is totally consistent with current law that provides: "the inventory search constitutes a well-defined exception to the warrant requirement." *Illinois v. Lafayette,* —— U.S. ——, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65 (1983) (*"Lafayette"*). As the Court in *Opperman* noted, "[t]he Fourth Amendment does not require that every search be made pursuant to a warrant. It prohibits only *unreasonable* searches and seizures." (emphasis original) 428 U.S. at 372–73, 96 S.Ct. at 3098–99 (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 509, 91 S.Ct. 2022, 2059, 29 L.Ed.2d 564 (1971) (Black, J., concurring and dissenting)). Moreover, "[i]n applying the reasonableness standard adopted by the Framers, [the] Court has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents." *Opperman,* 428 U.S. at 373, 96 S.Ct. at 3099. Thus, the justification for an inventory search "does not rest on probable cause and ... the absence of a warrant is immaterial to the reasonableness of the search." *Lafayette,* 103 S.Ct. at 2608.[7]

In conducting the automobile inventory search of the lawfully impounded 1982 Corvette, Officer Hostetter testified that he was following the "standard operating procedure" for the Indiana State Police Department. According to the Court in *Opperman:*

"When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. *These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger."* (citations omitted) (emphasis added).

428 U.S. at 369, 96 S.Ct. at 3097. *See also United States v. Maier,* 691 F.2d 421, 423 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983); *United States v. Dall,* 608 F.2d 910, 914 (1st Cir.1979), *cert. denied,* 445 U.S. 918, 100 S.Ct. 1280, 63 L.Ed.2d 603 (1980). When the automobile inventory search is carried out "in accordance with *standard procedures* in the local police department, [it] ... tend[s] to ensure that the intrusion [is] limited in scope to the extent necessary to carry out the caretaking function." (emphasis original) *Opperman,* 428 U.S. at 375, 96 S.Ct. at 3100. In this instance, Officer Hostetter's statement, that the automobile inventory search was carried out in accord with the "standard operating procedures" of the Indiana State Police De-

---

"(a) Whenever any police officer finds a vehicle standing upon a highway in violation of any of the provisions of this chapter, such officer is hereby authorized to require the driver or other person in charge of the vehicle to move the same, to a position off the paved or improved or main traveled part of such highway, provided that if any person so directed shall fail or refuse to move said vehicle or if such vehicle is unattended then such officer is hereby authorized to provide for the removal of such vehicle to the nearest available garage or other place of safety."

7. The fact that an inventory search is not premised upon probable cause distinguishes the inventory search of an automobile, and the packages contained therein, from the warrantless search of an automobile where probable cause for the search exists in the first instance. Thus,

the United States Supreme Court's rationale in the line of cases dealing with the warrantless search of an automobile, where probable cause for the search exists in the first instance, *see, e.g., United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *Robbins v. California,* 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981); *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); and *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), is inapplicable to a case involving an automobile inventory search. *See United States v. Chadwick,* 433 U.S. at 10 n. 5, 97 S.Ct. at 2482 n. 5; *United States v. Laing,* 708 F.2d 1568, 1571 (11th Cir.1983).

partment, is supported by the district court's finding of fact that "it was standard practice for state troopers to routinely undertake the inventory of such vehicles pursuant to a departmental policy which required that all impounded vehicles be searched prior to being towed or driven away by the towing service." Officer Hostetter's statement finds further support in this court's decision in *United States v. Balanow*, 528 F.2d 923 (7th Cir.1976) ("*Balanow*"), where, just as in this case, an Indiana State trooper conducted an inventory search of an automobile that was impounded due to the driver's inability to present a valid operator's license. In holding that the inventory search was reasonable, this court stated that, "*[u]nder normal [Indiana] state procedure, defendant's car was searched at the time of impounding.* The police had a right to inventory the contents of the impounded car." (emphasis added). *Balanow*, 528 F.2d at 924. Thus, Hostetter's decision to conduct an inventory search of the Corvette in order to protect the Griffins' property from damage, theft, and vandalism while in the custody of the Indiana State Police, to protect the Indiana State Police and the towing service against claims of lost or stolen property, and finally, to protect himself and other Indiana State Police officers from potential danger,[8] was standard operating procedure for the Indiana State Police Department and therefore reasonable.[9] *Accord Opperman*, 428 U.S. at

373, 96 S.Ct. at 3099. Based upon the evidence presented at the motion to suppress hearing, we agree with the district court and hold that Officer Hostetter properly impounded the 1982 Corvette and in accord with the "standard operating procedures" of the Indiana State Police Department, engaged in a routine, caretaking inventory search of the automobile. *See Opperman*, 428 U.S. at 375, 96 S.Ct. at 3100; *Cady*, 413 U.S. at 436, 93 S.Ct. at 2525. Moreover, in response to the Griffins' claim that the inventory search was nothing more than a pretext for an unlawful investigatory search the district court "remain[ed] unpersuaded that Trooper Hostetter undertook the inventory search as a subterfuge for an investigatory search." Upon our independent review of the record, we agree with the district court's finding that Officer Hostetter's inventory search was not a pretext for an unlawful investigatory search.

 We next consider whether the district court erred in finding that:

"[A]lthough Trooper Hostetter had the right to search the vehicle and retain the bag, for the purpose identified in *Opperman*, ... the maintenance of [sic] privacy expectation superior to the governmental interests articulated precludes the use of the inventory exception to authorize the opening of either the bag or the tape-wrapped package within." [10]

---

**8.** The United States Supreme Court in *Lafayette* identified these potential dangers when it stated that "[d]angerous instrumentalities—such as razor blades, bombs, or weapons—can be concealed in innocent looking articles." 103 S.Ct. at 2609.

**9.** Officer Hostetter testified that:

"[W]hen I take a car in for protective custody or to impound it I inventory that vehicle because our [sic] standard operating procedure

\* \* \* \* \* \*

It protects Roger Fulton who took the car in to put in his garage, protects me and protects the Griffins if something is taken."

**10.** The district court also relied upon "the absence of standard procedures regulating the scope of [the] search" to rule that Officer Hostetter's search of the lawfully impounded 1982

Corvette did not constitute a proper automobile inventory search. In light of Officer Hostetter's testimony that the inventory of impounded vehicles is "standard operating procedure" of the Indiana State Police Department, the district court's finding of the same, and this court's language in *Balanow* that normal Indiana procedure allows state troopers to perform an automobile inventory search at the time of impounding, we fail to understand the district court's concern over the Government's failure to show "the existence of any formal guideline or regulation defining the permissible scope of the trooper's search." The district court's attempt to distinguish the *scope* of the "standard operating procedure" used by the Indiana State Police and the one used by the Vermillion Police Department which was upheld by the Court in *Opperman* is without merit. In his concurrence in *Opperman*, Justice Powell noted that the

In sum, we must determine whether the scope of Hostetter's automobile inventory search was "reasonable" and thus within the confines of the Fourth Amendment. "As always, the reasonableness of [an] inventory search depends upon the particular facts and circumstances." *United States v. Laing,* 708 F.2d at 1571 (citing *United States v. Edwards,* 577 F.2d 883, 893 (5th Cir.), *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978)). To determine the reasonableness of an inventory search, we must "balanc[e] its intrusion on the individual's Fourth Amendment interest against its promotion of legitimate governmental interests." *Lafayette,* 103 S.Ct. at 2608 (quoting *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)). Of course, a routine automobile inventory search must be limited to the purposes for which it was effectuated. *United States v. Prescott,* 599 F.2d 103, 105 (5th Cir.1979). *See also United States v. Bosby,* 675 F.2d 1174, 1179 (11th Cir.1982); *United States v. Jackson,* 529 F.Supp. 1047, 1053 (D.Md.1981). In this instance, those purposes, which also constitute the legitimate governmental interests, include protecting the Griffins' property from damage, theft, and vandalism while in the custody of the Indiana State Police, protecting the Indiana State Police and the towing service against claims of lost or stolen property, and protecting Hostetter and other Indiana State Police officers from potential danger. *See Opperman,* 428 U.S. at 369, 96 S.Ct. at 3097. We balance these legitimate governmental interests against Charles and Jerome Griffins' expectation of privacy in a tape wrapped package placed in an unsecured brown paper bag and located in the unlocked storage compartment of an automobile that neither Charles nor Jerome owned.[11]

■■■ We initially note that "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *Opperman,* 428 U.S. at 367, 96 S.Ct. at 3096. *Accord United States v. Martinez-Fuerte,* 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976). As the Court in *Opperman* stated:

"In discharging their varied responsibilities for ensuring the public safety, law enforcement officials are necessarily brought into frequent contact with automobiles. Most of this contact is distinctly noncriminal in nature. Automobiles,

"standard inventory" of the Vermillion Police Department "consist[ed] of a survey of the vehicle's exterior—windows, fenders, trunk, and hood—apparently for damage, and its interior to locate 'valuables' for storage." *Opperman,* 428 U.S. at 380 n. 6, 96 S.Ct. at 3102 n. 6 (Powell, J., concurring). There exists no mention in *Opperman* of the scope of the inventory search once inside the interior of the vehicle. For this reason the district court's reliance upon the lack of a formal guideline or regulation defining the permissible scope of Hostetter's inventory search, once inside the automobile, is completely misplaced. In fact, it appears that the Indiana State Police Department's "standard operating procedure" is "essentially like that followed throughout the country," *Opperman,* 428 U.S. at 376, 96 S.Ct. at 3100, for the inventory search of an automobile.

The district court's mention of the lack of a formal guideline or regulation defining the permissible scope of an automobile inventory search appears to be a new and novel theory to further restrict law enforcement procedures under the guise of constitutional interpretation. We agree with the Court in *Lafayette* that, "[w]e

are hardly in a position to second-guess police departments as to what practical administrative method will best deter theft by and false claims against its employees and preserve the security of the stationhouse." *Lafayette,* 103 S.Ct. at 2610.

11. Despite the fact that neither Charles nor Jerome Griffin owned or had a property interest in the 1982 Corvette in which 805 grams of phencyclidine were found, both defendants had a legitimate expectation of privacy in the vehicle. According to the district court's findings of fact, Charles Griffin's close relative, his brother Cleota Griffin, owned the Corvette and with Cleota's permission, Charles and Jerome were exercising exclusive control over the vehicle on the evening of December 2, 1982. Thus, Charles and Jerome Griffin had standing to claim that the inventory search of the 1982 Corvette violated their privacy rights under the Fourth Amendment. *See United States v. Posey,* 663 F.2d 37, 41 (7th Cir.1981), *cert. denied,* 455 U.S. 959, 102 S.Ct. 1473, 71 L.Ed.2d 679 (1982) (citing *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)).

unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements." (citation omitted).

428 U.S. at 367–68, 96 S.Ct. at 3096–97. *See also Cady,* 413 U.S. at 441, 93 S.Ct. at 2528.[12] In this light we first consider whether it was reasonable for Officer Hostetter to open the unlocked lid of the recessed compartment behind the passenger's seat. On this issue we believe the decision in *Opperman,* where the Court upheld an inventory search of the contents of the unlocked glove compartment of an abandoned automobile, lawfully impounded by the police, to be dispositive. As the Court in *Opperman* stated:

"The inventory was not unreasonable in scope .... [O]nce the policeman was lawfully inside the car to secure the personal property in plain view, it was not unreasonable to open the unlocked glove compartment, to which vandals would have had ready and unobstructed access once inside the car."

428 U.S. at 376 n. 10, 96 S.Ct. at 3100 n. 10. Just as the unlocked glove compartment in *Opperman* was a "customary place ... for the temporary storage of valuables," 428 U.S. at 372, 96 S.Ct. at 3098, so too, in this instance, the unlocked recessed compartment behind the passenger's seat of the Corvette was an ideal place for the temporary storage of valuables. Thus, in furtherance of the legitimate governmental interests of protecting the vehicle and its contents from damage or theft, and protecting members of the Indiana State Police Department from liability and potential danger, we hold that it was reasonable for Officer Hostetter to open the unmarked lid of the recessed storage compartment. *Accord Cady,* 413 U.S. at 448, 93 S.Ct. at 2531 (the inventory search of an automobile trunk upheld as reasonable); *Cooper v. California,* 386 U.S. at 62, 87 S.Ct. at 791

(the inventory search of a glove compartment upheld as reasonable).

■ We next consider whether it was reasonable for Officer Hostetter to remove the unsecured brown paper bag from the compartment, retrieve from that bag a package wrapped in brown paper and secured with fibrous tape, and then open an unsecured end of that package. It is undisputed that once Hostetter observed the two revolvers in the recessed storage compartment and the brown bag lying beneath them, he was entitled to remove the revolvers and the bag in order to properly inventory and secure the items. The district court took issue, however, with Hostetter's next move, namely his retrieval and inspection of the tape wrapped package contained within the unsecured brown paper bag. According to the district court, Charles and Jerome Griffin had a reasonable expectation of privacy in the unsecured brown paper bag, and Hostetter, rather than opening the bag, should have simply inventoried "one brown bag." In the alternative, the district court concluded that even if it was proper for Officer Hostetter to retrieve the tape wrapped package from the brown paper bag, there was no reason for opening an unsecured end of that package; instead Hostetter could have inventoried "one tape wrapped package." *See, e.g., United States v. Bloomfield,* 594 F.2d 1200, 1203 (8th Cir.1979) (*"Bloomfield"*) (the inventory search of the contents of a zipped knapsack, tied with string, and contained within an automobile, held to be unreasonable). Despite the closeness of this issue, a review of the record and recent case law convinces this court that the district court improperly balanced the Griffins' expectation of privacy in the tape wrapped package contained within the unsecured brown paper bag, against the legitimate governmental interests involved in an inventory search.

In the instant case, the brown paper bag was not secured and thus its unknown con-

---

**12.** We realize, of course, that even though the expectation of privacy is "significantly less" in an automobile, a reasonable expectation of privacy can exist with regard to the contents of

that automobile. *See United States v. Wilson,* 636 F.2d 1161, 1163 (8th Cir.1980); *United States v. Jackson,* 529 F.Supp. at 1053.

tents could have fallen out and been misplaced, lost, or even stolen. (We know from various cases that 805 grams of phencycledine has a street value in excess of ten thousand dollars.) Officer Hostetter's decision to inventory and secure each and every item contained within the Corvette, including the contents of the unsecured brown paper bag, protected the bag's contents from falling out and being lost. As the court in *Bloomfield* stated, "[i]f a container which is to be inventoried is not securely closed so that the articles within could possibly fall out, it may be wiser for police to itemize the articles." 594 F.2d at 1203. In addition, Officer Hostetter's decision to itemize the unknown contents of the unsecured brown paper bag allowed the Indiana State Police Department to verify the bag's contents, and thus prevent false claims of lost or stolen property. The facts in this instance closely resemble those in *United States v. Laing,* 708 F.2d 1568 (11th Cir.1983) where a police officer, conducting a routine automobile inventory search, opened an "unusually heavy," unsecured Yahtzee box, "to see if it held anything of value that might need to be catalogued." 708 F.2d at 1571. The court held that "[t]his intrusion was justified by the purposes of an inventory search, especially the need to protect the police from claims pertaining to lost or stolen property." *Id.* It certainly was in furtherance of a legitimate governmental interest for Officer Hostetter to protect himself and the Indiana State Police Department from unwarranted liability in the event that the unsecured bag, and the material or articles contained therein, were lost, stolen, damaged, or misplaced.

In addition, there existed a reasonable likelihood of "potential danger" in an unsecured bag placed beneath two revolvers. Officer Hostetter testified that when he retrieved the unsecured brown paper bag, he immediately detected an unusual odor. When Hostetter ran a routine check on the two revolvers with his command post, he received no information. As a result, Hostetter was "suspicious" of the bag's contents, which could have ranged from worthless sand to valuable diamonds to instrumentalities of a crime, including additional weapons, contraband, or explosives. *See, e.g., Lafayette,* 103 S.Ct. at 2609. In light of the totality of the circumstances, we hold that the legitimate governmental interests of protecting the vehicle and its contents from being damaged or lost, and protecting members of the Indiana State Police Department from liability and potential danger, outweighed the Griffins' expectation of privacy in the unsecured brown paper bag. Accordingly, it was proper for Officer Hostetter, in the course of a routine caretaking automobile inventory search, to open the unsecured brown paper bag in order to determine its contents.

Finally, we review Officer Hostetter's decision to open an unsecured end of the package contained in the brown paper bag. On this issue we believe the United States Supreme Court's reasoning in *Lafayette* to be instructive, especially in light of the Court's substantial reliance in that case, upon the same governmental interests as those present in this instance. In *Lafayette,* the defendant was arrested for disturbing the peace and was taken to the "booking room" of the police station where he removed a package of cigarettes from his shoulder bag and placed the bag on a counter. A police officer, in the course of a preincarceration inventory search, removed the contents of the shoulder bag and found ten amphetamine pills inside a cigarette case package. The Court held that the inventorying of the defendant's shoulder bag at the stationhouse, preceding incarceration, was reasonable because it supported the legitimate governmental interest of "deter[ring] false claims [and] also inhibit[ing] theft or careless handling of articles taken from the arrested person." 103 S.Ct. at 2609. In addition, the Court noted that "[d]angerous instrumentalities—such as razor blades, bombs, or weapons—can be concealed in innocent looking articles taken from the arrestee's possession." *Id.* The Court recognized that "prior cases amply support this conclusion" and then proceeded to discuss the holding

in *Opperman,* that the automobile inventory search of a glove compartment was reasonable:

"because it served legitimate governmental interests that outweighed the individual's privacy interests in the contents of his car. Those measures protected the owner's property while it was in the custody of the police and protected police against possible false claims of theft."

*Id.* at 2610.

In the instant case, Hostetter had no knowledge of what the tape wrapped package contained but did know that the package was placed beneath two revolvers and emitted an unusual odor. As a result, Hostetter was "suspicious" of the package. Hostetter opened an unsecured end of the package to determine what it contained. Hostetter testified that he opened the package only because he was "responsible for what is in it," and furthermore, he never opened the clear bag enclosed within the package. The contents of the package could have ranged from worthless sand to valuable diamonds to dangerous instrumentalities of a crime, including additional weapons, contraband, or explosives. *See, e.g., Lafayette,* 103 S.Ct. at 2609. As the court stated in *United States v. Markland,* 635 F.2d 174, 176 (2nd Cir.1980), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2332, 68 L.Ed.2d 851 (1981) *("Markland"),* with regard to the inventory search of a zippered thermal package thrown from an automobile in the course of an accident:

"This does not mean, however, that [the police] officer ... was required to take the plastic thermal package into his custody with a 'pig in a poke' obviousness as to its contents. *This impersonal package could have contained anything from beer to bullion or a bomb. Its contents might have been perishable, valuable, or dangerous."* (emphasis added).

635 F.2d at 176. The court in *Markland* went on to hold that the opening of the zippered thermal package was consistent with the officer's "community caretaking

function." So too, in this instance it was within Hostetter's routine "community caretaking function" to observe, examine, and inventory the contents of the tape wrapped package, an act that "not only deters false claims but also inhibits theft or careless handling of articles ... [and uncovers] [d]angerous instrumentalities— such as razor blades, bombs, or weapons— ... concealed in innocent looking articles." *Lafayette,* 103 S.Ct. at 2609.

According to the Court in *Lafayette,* "the need to protect against such risks arises independent of a particular officer's subjective concerns." *Id.* at 2610. Thus, in order to protect the owner's property from damage, theft, or vandalism, the police and the towing service against claims of lost or stolen property, and the police officers from potential danger, Hostetter had a duty to perform a reasonable automobile inventory search of the 1982 Corvette. In light of the totality of the circumstances, including the presence of two revolvers and an unusual odor emanating from the unsecured brown paper bag, we hold that the legitimate governmental interests involved in an inventory search outweighed the Griffins' expectation of privacy in the tape wrapped package contained within the unsecured brown paper bag. As the United States Supreme Court has held in the context of an automobile search incident to a custodial arrest:

"[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile ... [and] may also examine the contents of any containers found within the passenger compartment .... Such a container may, of course, be searched whether it is open or closed, since the justification for the search is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have."

*New York v. Belton,* 453 U.S. 454, 460–61, 101 S.Ct. 2860, 2864–65, 69 L.Ed.2d 768

(1981). In the instant case, Officer Hostetter's lawful automobile inventory search justified the infringement of any privacy interest the Griffins may have had in a tape wrapped package contained within the passenger compartment of the 1982 Corvette. Accordingly, it was reasonable for Officer Hostetter to open the unsecured end of the tape wrapped package in the course of his routine caretaking automobile inventory search.

In so holding, we are cognizant of the fact that Hostetter could have inventoried "one brown bag" or "one tape wrapped package." The United States Supreme Court noted in *Lafayette* that the Illinois Appellate Court raised a similar argument, namely, " 'the defendant's shoulder bag could easily have been secured by sealing it within a plastic bag or box and placing it in a secured locker.' [*People v. Lafayette*], 99 Ill.App.3d [830] at 835 [55 Ill.Dec. 210 at 214], 425 N.E.2d [1383] at 1386" (citation omitted). 103 S.Ct. at 2610. The Court responded:

"Perhaps so, but the real question is not what 'could have been achieved,' but whether the Fourth Amendment *requires* such steps; it is not our function to write a manual on administering routine, neutral procedures of the stationhouse. Our role is to assure against violations of the Constitution.

\* \* \* \* \* \*

In language equally applicable to this case, we held, '[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable.' [*Cady*, 413 U.S. at 447, 93 S.Ct. at 2531]. *See also United States v. Martinez-Fuerte*, 428 U.S. 543, 557 n. 12 [96 S.Ct. 3074, 3082 n. 12, 49 L.Ed.2d 1116] (1976).

\* \* \* \* \* \*

Even if less intrusive means existed of protecting some particular types of property, it would be unreasonable to expect police officers in the everyday course of business to make fine and subtle distinctions in deciding which containers or items may be searched and which must be sealed as a unit. Only recently in *New York v. Belton*, 453 U.S. 454 [101 S.Ct. 2860, 69 L.Ed.2d 768] (1981), we stated: '[a] single familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interest involved in the specific circumstances they confront.' " (emphasis original).

*Id.* 103 S.Ct. at 2610-11, (quoting *Dunaway v. New York*, 442 U.S. 200, 213-14, 99 S.Ct. 2248, 2257-58, 60 L.Ed.2d 824 (1979)). Applying the Court's language to the instant case, the fact that Hostetter's inventory search may have been accomplished by "less intrusive" means, did not render the search unreasonable. We agree with the United States Supreme Court that "our role is to assure against violations of the Constitution" not to "write a manual on administering [the] routine, neutral procedure" of an automobile inventory search. *Lafayette*, 103 S.Ct. at 2610.

We are also aware of Justice Powell's concurrence in *Opperman* that "the *unrestrained* search of an automobile and its contents would constitute a serious intrusion upon the privacy of the individual in many circumstances." (emphasis added). 428 U.S. at 379-80, 96 S.Ct. at 3102-03 (Powell, J., concurring). Based upon the totality of the "facts and circumstances," *United States v. Laing*, 708 F.2d at 1571, including the Griffins' inability to produce documented proof of ownership of the 1982 Corvette, the fact that neither Charles nor Jerome could lawfully remove the vehicle from the heavily traveled Indiana Toll Road, the presence of two revolvers in an unlocked recessed compartment, and the unusual odor emanating from the unsecured brown paper bag, we uphold Officer Hostetter's routine caretaking automobile inventory search of the lawfully impounded 1982 Corvette. *See United States v. Maier*, 691 F.2d at 423-25; *United States v. Strahan*, 674 F.2d 96, 100-01 (1st Cir.), *cert. denied*, 456 U.S. 1010, 102 S.Ct. 2304, 73 L.Ed.2d 1306 (1982). The governmental

interest in protecting the Griffins' property from damage, theft, and vandalism while in the custody of the Indiana State Police, protecting the Indiana State Police and the towing service against claims of lost or stolen property, and protecting Hostetter and the Indiana State Police officers from potential danger, outweighed Charles and Jerome Griffins' expectation of privacy in a tape wrapped package placed in an unsecured brown paper bag and located in the unlocked storage compartment of an automobile that neither Charles nor Jerome owned. Accordingly we hold that Officer Hostetter's search of the lawfully impounded 1982 Corvette did constitute a proper automobile inventory search.

## III

We reverse the order of the district court granting defendants' Motion to Suppress the introduction into evidence of 805 grams of phencycledine, and remand this case for further proceedings consistent with this opinion.

ESCHBACH, Circuit Judge, dissenting.

There can be no doubt that an inventory search of a lawfully impounded vehicle is permitted, *see South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), and containers found during the search may be opened, *see Illinois v. Lafayette*, — U.S. —, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). Nevertheless, the government must prove that such a search was truly inventorial, and not investigative. In other words, the government must demonstrate that the search was performed "in accordance with established inventory procedures." *Id.* 103 S.Ct. at 2611; *see South Dakota v. Opperman*, 428 U.S. at 372, 96 S.Ct. at 3098. Absent proof of compliance with settled inventory rules, evidence seized during the search must be suppressed. *See, e.g., State v. Jewell*, 338 So.2d 633 (La.1976); *State v. Blais*, 416 A.2d 1253 (Me.1980).

The district court found that the Indiana State Police has a "departmental policy that all impounded vehicles be inventoried prior to being towed or driven away." This finding is based on the testimony of Trooper Hostetter who stated: "[W]hen I take a car in for protective custody or to impound it I inventory that vehicle because our standard operating procedure I am supposed to do that. That protects the wrecker service and protects me." Indeed, in *United States v. Balanow*, 528 F.2d 923 (7th Cir. 1976), we recognized the same policy of inventorying cars before turning them over to tow-service drivers.

The uncontroverted testimony in this case reveals, however, that the standard practice was not followed. To be sure, Trooper Hostetter did conduct an inventory search prior to turning the car over to Roger Fulton—the tow-service driver. In the course of that search the trooper noticed, but did not open, a package wrapped in plastic tape. Only after Roger Fulton drove the car to a maintenance area did Trooper Hostetter renew his search, open the wrapped package, and discover the phencycledine.

If the established practice is to inventory a car *before* it is turned over to a tow-service driver, I must conclude that the search in the maintenance area was not in accord with settled procedures. Trooper Hostetter, in directing Roger Fulton to drive the car to a maintenance area, implicitly acknowledged that the roadside inventory search was adequate to protect himself and Roger Fulton. The subsequent search in the maintenance area, and the opening of what Trooper Hostetter termed a "suspicious" package, simply do not square with the routine inventory practice. To summarize, I am unaware of any Indiana State Police policy that calls for two inventory searches—one roadside search and one subsequent search to investigate "suspicious" items.

I would thus affirm without discussing the merits of the district court's conclusion that the evidence must be suppressed because "the scope of the search appears to have been left to the absolute discretion of Trooper Hostetter." I cannot subscribe, however, to the majority's characterization of the district court's reasoning as "a new and novel theory to further restrict law enforcement procedures under the guise of

constitutional interpretation." *See* Majority Opinion at 483 n. 10.

As noted above, inventory searches are constitutionally permissible only if performed in accord with standardized procedures. This principle of law would be meaningless if an adequate "standardized procedure" is the commitment of absolute discretion in the searching officer. As the Ninth Circuit noted in *United States v. Hellman,* 556 F.2d 442 (1977), "[a] locally followed practice gives some assurance that a particular car was not singled out for special searching attention." *Id.* at 444; *see generally* 2 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 7.4, at 576–77 (1978). Indeed Justice Powell, whose vote was needed for a majority in *Opperman,* finds inventory searches reasonable because "no significant discretion is placed in the hands of the individual officer: he usually has no choice as to the subject of the search *or its scope.*" *South Dakota v. Opperman,* 428 U.S. at 384, 96 S.Ct. at 3104 (Powell, J., concurring) (emphasis added). I leave for another day the question whether the Indiana State Police's inventory policy is sufficiently specific. I need only note that the policy, as general as it is, did not sanction the trooper's actions in this case.

I respectfully dissent.