**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Harry SHOLOLA, Defendant–Appellant.**

**No. 96–2199.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 21, 1997.

Decided Aug. 22, 1997.

Barry Rand Elden, Chief of Appeals, Patrick S. Layng (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

James J. Cutrone (argued), Chicago, IL, for Defendant–Appellant.

Before COFFEY, MANION and DIANE P. WOOD, Circuit Judges.

COFFEY, Circuit Judge.

On August 31, 1995, a federal grand jury returned an indictment against the defendant-appellant, Harry Sholola, charging him with one count of conspiracy to import heroin into the United States from India, in violation of 21 U.S.C. §§ 952(a) & 963, and ten separate counts of importing heroin from India, in violation of 21 U.S.C. § 952(a), and one count of possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1). The Government charged that Sholola maintained and used mail boxes in the Chicago, Illinois area, rented under false names, for the purpose of receiving "approximately ounce quantities" of "mixtures containing heroin" from his co-conspirator(s) in India. The evidence against Sholola included: (1) fifteen envelopes "containing mixtures of heroin" that were seized from the mailboxes rented by the defendant; and (2) approximately 123 grams of heroin recovered by authorities from a public storage locker, also rented by the defendant.[1]

Sholola filed a motion to suppress, arguing that the evidence should be excluded as the "direct and indirect fruit" of conduct by law enforcement officials that violated the Fourth Amendment. Specifically, Sholola argued that: (1) police officers lacked probable cause to arrest him outside of a bank in Orland Park, Illinois, on suspicion of credit-card fraud; and (2) the officers exceeded the bounds of the Fourth Amendment when they searched an automobile, incident to that arrest, and discovered, *inter alia*, information that led investigators to the storage locker and mailboxes rented by the defendant as part of his heroin-importation scheme. Relying on *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), Sholola also challenged the warrantless search of the storage locker,[2] arguing that he consented to this search during a time frame in which he alleges that he was unlawfully detained without a hearing. *Riverside* makes clear that: (1) it is presumptively reasonable for police to hold an arrestee without a hearing for as long forty-eight hours; and (2) shorter periods of detention (such as Sholola's thirty-nine and one-half hours in length) are only unlawful if the arrestee can establish that he was held for an improper purpose (i.e., in order that police might collect additional evidence to justify his arrest and confinement). *Id.*; *see also United States v. Daniels*, 64 F.3d 311, 313 (7th Cir.1995). The district court found that: (1) Sholola was held for 36 hours;[3] and (2) the purpose in detaining him was not to discover additional evidence to justify his arrest on state-law charges. Notwithstanding these clear and unambiguous findings of fact, Sholola argues on appeal that his consent to the storage locker search was tainted by a *Riverside* violation and thus invalid.

After conducting an evidentiary hearing on December 1, 1995, in connection with the federal charges against Sholola, the district judge denied the portions of the defendant's motion to suppress which challenged the va-

---

1. According to Sholola's Presentence Investigation Report ("PSR"), a total of 332.87 grams of heroin were mailed to the defendant from India during the period from December 1994 through July 1995.

2. Sholola first advanced this argument in a "supplemental memorandum" to his motion to suppress.

3. Although the parties refer to a 36–hour period (an estimate accepted by the district court) our review of the record shows that it was more like 39.5 hours between the completion of the booking process at 6:00 PM on July 11 and 9:30 AM on July 13, when Sholola appeared before a judicial officer on the state theft charge.

lidity of his arrest as well as the search of the automobile under the Fourth Amendment. The court continued the hearing to address the issue of whether the search of the defendant's storage locker was proper, and also to determine the validity of the defendant's "*Terry* stop" (i.e., whether the officer who initially stopped Sholola for questioning had "reasonable suspicion [of] criminal activity.") *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Thereafter, the judge denied Sholola's suppression motion in its entirety.

On February 2, 1996, Sholola withdrew his plea of not guilty to the charge of conspiring to import heroin and, pursuant to a written agreement with the Government, entered a conditional guilty plea in which he admitted to the charge of conspiring to import heroin while reserving the right to appeal the district court's ruling on his motion to suppress. Following a change-of-plea hearing, the court accepted Sholola's conditional guilty plea and entered a judgment of conviction. On May 7, 1996, Sholola was sentenced to thirty-seven months imprisonment, to be followed by five years of supervised release, and ordered to pay a special assessment of $50. On appeal, the defendant asserts that the court improperly denied his motion to suppress.[4] We affirm.

## I. BACKGROUND

At approximately 3:45 PM on the afternoon of July 11, 1995, the defendant, Harry Sholola, entered the A.J. Smith Federal Bank (the "Bank") in Orland Park, Illinois. He was observed by Patrolman Anthony Farrell, a nine-year veteran of the Orland Park Police Department who had been employed at the Bank as a part-time security guard for more than three years.[5] Farrell testified that he had been employed as a security officer prior to becoming a policeman, and that in all he had approximately eleven years' experience working as a security guard, mostly at retail establishments.

His duties at the Bank included "patrol[ling] the inside of the bank and keep[ing] an eye on the parking lot ... to ensure the safety of the employees in the Bank." Farrell took note of the defendant, whom he did not recognize as a regular customer, as well as the defendant's appearance (the defendant's shirt was soiled and his necktie was improperly knotted). Farrell watched Sholola approach the teller's window, where he produced a VISA credit card and a California driver's license. The teller, Carina Julian, made eye contact with Officer Farrell and nodded toward a back room.[6] Farrell and Julian met in the back room, leaving Sholola at the teller's window. Because Julian was suspicious, she displayed the credit card and driver's license to Farrell that Sholola had presented. She also informed Officer Farrell that Sholola had requested a cash advance of $1,900. The name on the credit card and the driver's license presented was "Joeh Alejandre," and Sholola's picture was on the driver's license. While in Julian's presence, Farrell telephoned the Orland Park Police Station and asked the dispatcher to run a computerized check on the driver's license, using both the number on the license and the name Joeh Alejandre. The dispatcher accessed the records of the California Department of Motor Vehicles ("DMV") and reported that the California DMV had no record on file of a driver's license issued to Joeh Alejandre. Officer Farrell suggested to Julian that she run the necessary checks on the credit card and consult with her supervisor. Julian contacted the credit card company and determined that the card was valid and that a $1,900 cash advance was authorized. With regard to whether Julian should process the transaction, Farrell "told her to do whatever the bank told her to do." Farrell returned to the lobby, and observed Sholola signing a cash advance slip and receiving the $1,900. Sholola placed the money in his pocket and exited through the Bank's front entrance onto the parking lot.

---

**4.** Sholola does not raise any challenges to the court's sentencing order.

**5.** Officer Farrell testified that during his off duty hours, he worked six-hour shifts at the Bank, between four and five times each month.

**6.** This was a pre-arranged signal at the Bank, communicating to Bank personnel that a private conversation was needed at once.

Officer Farrell followed Sholola, and observed him walking toward a pick-up truck in the Bank's parking lot. Farrell temporarily lost sight of the defendant behind the truck, and shortly thereafter noticed Sholola "peek[ing] out from alongside of [the] pick-up truck." As Farrell started to walk towards him, Sholola began to walk away from the officer. Officer Farrell described his gait as being "a very quick, fast-paced walk." Sholola made his way to the south exit of the Bank's parking lot and, as he was about to cross a heavily-travelled highway, Officer Farrell initiated "verbal contact," raising his voice and directing the defendant to *stop*. Sholola did not respond initially, and continued to cross the street and enter upon a garden supply store's parking lot. Once in this lot, Sholola stopped and Officer Farrell approached and questioned him.

Officer Farrell testified that even though he was in full police uniform and dress, he commenced his interview by identifying himself to Sholola as an officer of the law. Farrell inquired of the defendant as to where he was going, and he replied that he was on his way to purchase flowers. At this time, Officer Farrell requested identification from Sholola, and the defendant provided the bogus driver's license he had used in the Bank (concerning which the California DMV had no record, as Farrell knew). Farrell asked Sholola if he had a car and, if so, where it was parked. The defendant said that he did have a vehicle and pointed to a maroon, four-door Honda Acura (the "Acura") parked in the garden center's parking lot. Farrell asked if he had keys to the car and could prove that it belonged to him. Instead of answering "Yes" or "No," Sholola produced some keys from his pocket, walked towards the vehicle, opened the front driver's side door, and stated, "See, it's my car." When Sholola was about to enter the vehicle, Officer Farrell directed him to move away from the door. As Sholola exited the vehicle, the officer positioned himself between the defendant and the open car door.

Farrell asked Sholola his age, and the defendant replied that he was forty-four years of age, an answer that contrasted with the information reflected on Alejandre's driver's license, which showed an age of thirty-six years. Farrell repeated the age question, and Sholola changed his answer; this time he stated that he was thirty-eight years of age. The officer then asked the defendant where he lived, and Sholola identified a community other than San Bernadino, California, the residence listed on the license. Furthermore, Sholola misspelled the surname "Alejandre" (spelling the name differently from what appeared on the license). Finally, Officer Farrell re-phrased the age question he had asked twice previously by inquiring of Sholola his date of birth, but once again the defendant's answer failed to correspond with the information on the driver's license.

Considering the knowledge he had gained through his observations of the defendant, including the i.d. discrepancies revealed during his questioning of Sholola, Officer Farrell requested that the Orland Park Police dispatcher run a computerized check on the Acura's Illinois license plate. This check revealed that the vehicle was registered to a woman residing in Tinley Park, Illinois, and that there were no outstanding warrants for the owner of the vehicle, nor any reports of the vehicle being stolen. At the time Farrell requested the Acura's license plate check, he also asked for back-up assistance. During the evidentiary hearing, Officer Farrell was asked whether Sholola was "free to leave" at this point in the encounter (even though he had not been placed under arrest) and the officer answered "No." Shortly after Farrell's request for assistance, Officer Joseph Swearingen arrived on the scene, followed shortly by Sergeant Thomas Lynch, Farrell's superior officer, a sixteen-year veteran of the Orland Park Police Department. Farrell related to Sergeant Lynch a summary of the events that had transpired up until this point, including his interview with Sholola and the defendant's inability to provide answers that corresponded with the information set forth on the California driver's license. When Farrell was asked on cross-examination if the information available to Lynch, at this juncture, was the same as his own, Farrell replied that it was. Having thus acquired Officer Farrell's knowledge of the situation, Sergeant Lynch took the driver's license and commenced to interview the

defendant concerning the information set forth thereon. Like Officer Farrell, Sergeant Lynch received from the defendant answers that were at variance with the information on the license. Specifically, Sergeant Lynch recounted:

I looked at [the license], and then I walked over by the defendant and asked him for his name, which he provided, which was the same as on the driver's license. I asked for a date of birth, and he did not give me the same date of birth that was on the driver's license, and then I asked him what his age was, and his age was quite *drastically different* from the date of birth that he provided.

Sergeant Lynch and Officer Farrell held "a brief conference" to discuss the situation, in light of all of Sholola's suspicious conduct up to this point in time, including his disheveled appearance, his use of the fraudulent i.d. to obtain cash from the Bank, his elusive behavior immediately following the transaction when he was followed by Officer Farrell, and finally his inconsistent statements and his repeated failure to provide answers that corresponded with the information on his purported license. Based on the officers' collective knowledge about the suspect at this point in time, "it was determined that Mr. Sholola was going to be placed under arrest for further investigation." Sergeant Lynch directed that Sholola be "take[n] into custody for investigation of deceptive practices at the bank."

At the time of his arrest, Sholola was standing near the open driver's side door of the Acura. Immediately following the arrest, Officer Swearingen handcuffed Sholola and escorted him to a squad car that was about two car-lengths away from the maroon Acura. Sholola was searched, and on his person were found the credit card he used in the Bank (reflecting the name "Alejandre"), as well as the $1,900 and the receipt he had obtained during the cash advance transaction. Shortly thereafter, Sergeant Lynch and Officer Farrell searched the interior of

the Acura vehicle over which Sholola had claimed ownership, for, in Farrell's words, "any possible weapons and any other information we might find relative to the credit card fraud investigation that we were involved in." Sergeant Lynch searched the passenger side of the vehicle, while Officer Farrell searched the driver's side. In the glove box of the car, they discovered a total of $5,400 in U.S. currency in $100 denominations. The cash was contained in an envelope, along with a cash advance receipt in the amount of $3,000. This receipt had been issued to an individual named "Alejandre" earlier the same day (7/11/95) by another bank in Orland Park. The search also yielded a second credit card and a second California DMV document *with Sholola's picture on it*,[7] both issued in the name of one Glenn Aby. The police thus had in their possession *two* separate forms of identification bearing Sholola's picture, both of which were phony, and *two bogus credit cards*, issued under different names, both of which had been used by the defendant to obtain cash on the very same day. The search of the vehicle also uncovered papers and documents reflecting various names and social security numbers, assorted mailbox keys, and a receipt and access card indicating that Sholola had rented a storage locker in Markham, Illinois. The officers placed these papers and other items in a bag, and conveyed them in police custody to department headquarters, where they were inventoried (and later turned over to a Secret Service Agent).

Following the search of the maroon Acura, Officer Swearingen transported Sholola to the Orland Park Police headquarters and proceeded to book him, filling out a form designated as a "scratch sheet" which noted that Sholola was being held on a charge of theft by deception.[8] The record reflects that at this juncture, the defendant volunteered his true identity: Harry Sholola. The booking of the defendant was completed on July 11 at about 6:00 PM. Officer Swearingen was called as a defense witness and initially testi-

---

7. Officer Farrell referred to this document as a California "driver's license," while elsewhere in the record it is mentioned as a "California state identification card."

8. In Illinois, "theft by deception" is defined as "obtain[ing] by deception control over property of the owner." 720 ILCS 5/16–1(a)(2).

fied that during the defendant's booking process, he entered on the "scratch sheet" a proposed court date of July 13 at 9:30 AM. On cross-examination, however, Officer Swearingen corrected this testimony and averred that he could not have entered the court-date information while booking Sholola on July 11 "because the investigation was still going on." Swearingen stated that he likely entered the information about Sholola's scheduled court appearance late on the following day, July 12, probably after being instructed to do so by his superior officer, Detective Thomas Kenealy. Officer Swearingen also testified that during his one-year service as a police officer in Orland Park, he had personally arrested some twenty-nine suspects on criminal charges, and that twenty-eight of these individuals had appeared before a judicial officer for a probable cause hearing the morning following their arrest.

After the completion of Sholola's booking (July 11 at 6:00 PM), the Orland Park Police Department contacted the Secret Service in Chicago and advised them that they had recovered evidence suggesting Sholola's involvement in "a larger credit card scheme" that might warrant investigation by federal authorities, i.e., a scheme that went beyond the single transaction at the Bank. Secret Service Special Agent Mark Oliphant[9] was assigned to the case and arrived at the Orland Park police station around 6:45 PM, whereupon he briefly reviewed the items found in the Acura. Agent Oliphant's understanding was that Sholola was being held in state custody for the charge of theft (on the basis of the fraudulent transaction at the Bank) while the federal investigation of Sholola proceeded. Agent Oliphant, accompanied by Officers Swearingen and Farrell, left the police station around 7:00 PM and proceeded to two of the local addresses where Sholola allegedly resided. Oliphant's purpose in checking these addresses was to "determine the authenticity of the documents" discovered in the Acura. His investigation and his interviews with neighbors at each of the locations revealed that the two addresses had been "vacant for some time." Using the

storage locker access card and a related receipt found in the Acura as a lead, Agent Oliphant also visited a storage locker facility in Markham, Illinois, where he gained knowledge that the defendant had in fact rented a locker, and was in arrears on his rental payments.

Oliphant returned to the Orland Park Police Department at about 11:00 PM to interview Sholola about the credit card fraud. In Officer Swearingen's presence, the Secret Service Agent administered *Miranda* warnings to the defendant and proceeded to obtain some personal history information from the defendant. When Oliphant asked to speak with Sholola about the credit card fraud for which he had been arrested earlier in the day, the defendant stated, "I don't have an answer, I understand what you are saying." When Oliphant emphasized to the defendant that he "had a lot of information about [his] participation in credit card fraud," Sholola stated that he wished to speak with an attorney before answering any more questions, and the interview came to an end.

During the morning of July 12, Agent Oliphant, continuing his investigation of Sholola's involvement in a broader credit card scheme, made telephone inquiries regarding the credit cards found in Sholola's possession. He also telephoned the district manager of the storage locker company "to determine the status of Mr. Sholola's locker." At approximately 9:00 AM, Agent Oliphant spoke with Assistant State's Attorney Cassidy about obtaining a search warrant for the locker, but this course of action was abandoned later in the day when Detective Kenealy of the Orland Park Police Department called Oliphant and suggested that he would attempt to get the defendant to sign a voluntary consent to search form, in lieu of obtaining a search warrant (Sholola gave his written consent to the search of the storage locker only).

Agent Oliphant searched the locker on the evening of July 12, and found approximately 123 grams of heroin, as well as papers noting

---

**9.** Oliphant had approximately seven years' experience as an agent and had investigated about a hundred credit card fraud cases.

that the defendant had rented mailboxes at various "Mail Box, Etc." locations. As far as the record reveals, the federal investigation of Sholola up until this time had centered on his apparently extensive fraudulent credit card activity; the heroin discovered in the storage locker being the first indication of Sholola's involvement in narcotics trafficking. The information recovered from the locker, together with the mailbox keys and papers found in the Acura, led federal investigators to mailboxes that Sholola had rented (using aliases) at four different "Mail Box, Etc." locations in the greater Chicago, Illinois area. Federal investigators obtained a search warrant for these mailboxes and uncovered a total of fifteen envelopes mailed to the defendant in the United States from India, each containing quantities of heroin, in violation of federal law. Thus, what first appeared to be a state credit card scam involving the single incident at the A.J. Smith Bank evolved into a federal investigation of Sholola's apparently extensive credit card scheme or schemes and ultimately into the defendant's involvement in drug trafficking, which led to the federal drug conviction on appeal here.

At 9:30 AM on July 13, thirty-nine and one-half hours after the completion of the booking process, Sholola was brought before a state judicial officer for a hearing to determine probable cause as to the Illinois theft charge arising out of the defendant's use of fraudulent documents at the Bank. Neither the record nor the parties' briefs shed light on the details of this proceeding, but we are able to conclude from the record that probable cause was found as to the state charge of theft by deception.[10]

On July 17, a federal magistrate filed a criminal complaint, charging Sholola with conspiracy to possess with intent to distribute heroin, in violation of 21 U.S.C. § 846, on the basis of an affidavit, sworn to by Secret Service Special Agent Daniel Overvoll, detailing the information his agency possessed at that time concerning Sholola's heroin importation scheme. Sholola was arrested by federal authorities on August 2 and detained pending trial, after a magistrate judge determined after a hearing that there was probable cause to believe Sholola had conspired to possess with intent to distribute heroin, as alleged in the federal complaint.[11] A grand jury later returned the aforementioned twelve-count indictment, Count I of which charged Sholola with conspiring to import heroin from India. As set forth above, Sholola filed a motion to suppress the evidence, and the trial judge denied the same after conducting an evidentiary hearing. The defendant entered a conditional guilty plea to Count I, reserving the right to appeal the judge's suppression ruling, and was sentenced.

## II. ISSUES

On appeal, Sholola asserts that the district judge's denial of his motion to suppress was erroneous and should be reversed, arguing that the evidence against him was obtained in violation of the Fourth Amendment. Specifically, the defendant-appellant argues that: (1) at the time Officer Farrell stopped him for questioning in the garden-center parking lot located near the Bank, he lacked reasonable suspicion of criminal activity; (2) Farrell and his fellow officers lacked probable cause to arrest him; and (3) the warrantless search of the Acura, which took place shortly after his arrest, violated the Fourth Amendment. Sholola also maintains, as he did before the trial judge, that the evidence gained as a result of the search of the storage locker should be suppressed because he gave his consent to that search while allegedly being held by police in violation of *Riverside*, 500 U.S. 44, 111 S.Ct. 1661.

---

**10.** Sholola's PSR reveals that on September 1, 1995, in connection with the incident at the A.J. Smith Bank, the defendant pleaded guilty to state "charges of theft of over $300," and that in April 1996 prosecutors entered a *nolle prosequi* in the case. In order for the state case against Sholola to proceed as far as it did, we conclude that probable cause must have been found at the July 13 hearing.

**11.** The magistrate judge's detention order noted that "the circumstances of the defendant's arrest in Tinley Park demonstrate that it is likely he was engaged in the use of fraudulent identification documents and credit cards."

### III. ANALYSIS

#### 1. *Standard of Review*

In reviewing a district judge's ruling on a motion to suppress, this court reviews questions of law de novo and questions of fact for clear error. *United States v. Liss*, 103 F.3d 617, 620 (7th Cir.1997). A factual finding is clearly erroneous "when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id.* (quotation omitted). The United States Supreme Court recently held in *Ornelas v. United States* that determinations of reasonable suspicion and probable cause are mixed questions of law and fact which, "as a general matter ... should be reviewed *de novo* on appeal." —— U.S. ——, ——, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996). The *Ornelas* Court emphasized, however, that "a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that *deserve deference*." *Id.* (emphasis added). Under the *Ornelas* standard, "a reviewing court should take care both to review findings of historical fact only for *clear error* and to give *due weight to inferences drawn from those facts by resident judges and local law enforcement officials*." *Id.* (emphasis added). Similarly, our own cases have held that "[b]ecause the resolution of a motion to suppress is necessarily fact-specific, we give special deference to the district court that heard the testimony and observed the witnesses at the suppression hearing." *United States v. Stribling*, 94 F.3d 321, 323 (7th Cir.1996).

#### 2. *Officer Farrell's "Investigatory Stop" of the Defendant*

Sholola initially claims that he was subjected to an unreasonable seizure in violation of the Fourth Amendment because, at the time that Officer Farrell stopped him for questioning (i.e., a *Terry* stop), the officer lacked a reasonable suspicion of criminal activity. The trial judge rejected this argument after inquiring, during the evidentiary hearing, into all the facts and circumstances known to Officer Farrell and the Orland Park Police at the time Farrell stopped Sholola for questioning, including the officer's observations of and about the defendant before, during, and immediately following the fraudulent credit card transaction at the Bank. The trial judge's review of the evidence included a thorough inquiry into the reliability of the computerized check procedure which Officer Farrell (through the Orland Park Police dispatcher) utilized to determine that the California DMV had "no record on file" of any driver's license issued to Joeh Alejandre. In addition to Farrell's testimony, the court heard testimony from: (1) an expert on law enforcement information systems (including computer databases); (2) the Orland Park Police dispatcher who actually ran the check on "Alejandre" at Officer Farrell's request; and (3) a California DMV official who worked in a special unit responsible for making DMV records available to law enforcement agencies nationwide. Farrell testified that, in his understanding, " 'no record on file' means that the license has not been issued, there is no record of the license ever being issued." Similarly, the DMV official testified that when a computerized search yields the result, "no record on file" (or "record unavailable"), "[t]hat means there is no current record in our system. So it's either, if it was ever a good number, it has been purged, or it may not have ever been a good number." The DMV official further testified that as of December 1995 (the month prior to the evidentiary hearing), there was *still* no record of the "Alejandre" license in the DMV's records. After hearing all of the testimony concerning the computerized search, the trial judge stated that she "[didn't] have any doubt" that the information generated by the computer search was "reliable" and "correct," describing the "regular business records of driver's license authorities" as the most reliable information available concerning the validity of a license. Based in part on the fact that Farrell "had run a routine inquiry on a system that should be reliable and *it came back without any information*," the district judge concluded that Farrell "had a basis ... for stopping [the defendant]." Referring to the defendant's behavior following the suspicious credit card transaction, the judge also noted that

Officer Farrell "could have drawn a conclusion that [Sholola] acted oddly when he was outside the bank," providing further justification for the stop.

Since the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968), it is well-established that a law enforcement officer may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' *even if the officer lacks probable cause* [to arrest.]" *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (citing *Terry*) (emphasis added). As this Court has explained:

> The requirement that the officers' suspicion be articulable prevents the police from stopping a person on the basis of pure, even if inspired, hunch. The police must be able to give a *rational explanation* for why they suspected the person they stopped. This is an important requirement because without it the police could stop people at will, a *carte blanche* that has been thought inconsistent with the limitations that the Fourth Amendment places on the power to search and seize. . . .

*United States v. Feliciano*, 45 F.3d 1070, 1072 (7th Cir.), *cert. denied*, — U.S. —, 116 S.Ct. 153, 133 L.Ed.2d 97 (1995) (emphasis added).

■ Applying the dictates of the Supreme Court, we have consistently held that "[r]easonable suspicion is to be determined in light of the *totality of the circumstances*." *United States v. Duguay*, 93 F.3d 346, 350 (7th Cir.1996) (citations omitted) (emphasis added); *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). Specifically, "[t]he inquiry on appeal must focus on 'the events which occurred leading up to the stop or search, and then the [trial judge's] decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion.'" *Duguay*, 93 F.3d at 350 (quoting *Ornelas*, — U.S. at —, 116 S.Ct. at 1661). Our review of the totality of the facts and circumstances surrounding the *Terry* stop of the defendant Sholola, as revealed by the uncontradicted testimony of Officer Farrell and others, persuades us that at the time Officer Farrell stopped the defendant for questioning, he had "a reasonable suspicion supported by articulable facts that criminal activity 'may [have been] afoot.'" *Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585 (citing *Terry*).

■ The Supreme Court has held that in assessing whether an officer had reasonable suspicion, the "evidence . . . must be seen and weighed not in terms of library analysis by scholars, but as understood by those *versed in the field of law enforcement*." *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695 (emphasis added). Similarly, our precedents acknowledge that an officer's experience, knowledge, and expertise are relevant to a consideration of the "totality of the circumstances." *See, e.g.*, *United States v. McCarthur*, 6 F.3d 1270, 1277–78 (7th Cir.1993). Initially, we note that Officer Farrell had some eleven years of experience working as a security guard, three of those years in the very bank where he observed Sholola, and that he had been a police officer in the Orland Park community for nine years. Farrell testified that he was "generally familiar" with the Bank's customers and that he did not recognize Sholola as one of the Bank's regular customers when he entered the Bank lobby on the afternoon of July 11. Additionally, Farrell testified that Sholola was wearing a "soiled" shirt and an improperly-knotted necktie. The fact that Officer Farrell did not recognize Sholola as a regular Bank customer, and/or the fact that Sholola was somewhat disheveled, would not by themselves give rise to reasonable suspicion of criminal conduct warranting a *Terry* stop of the defendant. In order to justify such a stop, "[t]he officer . . . must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch'" that the individual in question is somehow involved in criminal activity. *Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585. However, in this case, the "hunches" and observations of Officer Farrell, an experienced local law enforcement officer familiar with the Bank and its regular clientele, led to more concrete or "particularized" suspicion justifying a stop.

After Sholola entered the lobby and aroused Officer Farrell's notice, Farrell continued to watch the defendant approach the teller's window to request a *sizable* cash advance on a credit card ($1,900), and watched from a distance of five to ten feet as Sholola presented "a credit card and some type of driver's license or i.d." Like Farrell, the teller found Sholola somewhat suspicious and conferred with the officer about how to proceed, informing him that the defendant had presented a VISA card and a California driver's license both issued in the name of "Joeh Alejandre." Through the Orland Park Police dispatcher, Farrell was able to access a law enforcement computer network (known as "LEADS") that included records from the California DMV.[12] This computerized criminal check procedure, which the trial judge found to be "reliable," and which was run using both the name "Alejandre" *and* the number on the driver's license, produced a "no record on file" result (each time). Sholola, in an attempt to show that Officer Farrell's suspicions of criminal activity were not "reasonable," has zeroed in on the computerized search results, speculating that the result of "no record on file" was "ambiguous" because the driver's license *might* have been issued too recently to be entered into the database. Sholola's brief goes so far as to assert that this Court "may place no weight whatsoever on the computer generated response [of 'no record on file']." We disagree. Initially, we observe that the defendant's "too-recent-to-be-on-file" theory is belied by the record, which shows that not only was there no record of the "Alejandre" license as of July 11, 1995, but also that there was no record of such a license some *six months later*, just prior to the evidentiary hearing. Moreover, as Farrell and the DMV official both testified at the evidentiary hearing, the

meaning of "no record on file" is that no such license has ever been issued.[13] Farrell did not explicitly testify that prior to stopping the defendant he rejected the remote possibility that the license was too recent to appear in the computer database, nor did he specifically state that he had drawn an inference that the license was phony. Nevertheless, the validity of the license was clearly questionable, at best, in light of the results of the computerized search. This fact, in combination with everything Officer Farrell had observed about the defendant before, during, and after the transaction, led him to stop the defendant for questioning. This experienced officer's suspicions of criminal activity (i.e., theft by deception) later proved to be correct.

Even if we accept Sholola's argument that the computerized "no record on file" result was ambiguous, we observe that the "reasonable suspicion" standard, *by its very nature*, allows for some degree of ambiguity or uncertainty. *See, e.g., Cortez*, 449 U.S. at 418, 101 S.Ct. at 695 (reasonable suspicion "does not deal with *hard certainties*, but with *probabilities*.") (emphasis added). As the Government notes in its brief, "[t]he test is whether the officer had a reasonable suspicion a crime had been committed, not whether there was also a plausible innocent explanation for the circumstances." By grasping for an "innocent explanation" for the "no record on file" result, counsel for Sholola in effect contends that Officer Farrell was required to have proof of criminal activity "beyond a reasonable doubt" before stopping Sholola for questioning, when the Fourth Amendment merely required him to have a "reasonable suspicion."

Finally, we wish to emphasize that the knowledge possessed by Farrell *at the time*

---

**12.** The LEADS system can be utilized to access the records of criminal justice agencies nationwide, or to access state records pertaining to driver's licenses, vehicle registration, titles, etc. Here, the system was used for the specific purpose of determining whether the California DMV had a record of the Alejandre driver's license on file. Officer Farrell apparently did not request that the dispatcher run a broader criminal history check under the name Alejandre.

**13.** When asked if a computerized record *might* be unavailable because the license has been issued too recently to show up on the computer, Farrell responded, "That has happened with motor vehicle license *plates* where we have found that the [Illinois] Secretary of State's office was behind in entering them, yes." This response, based on Farrell's experience with *Illinois* records for license *plates* (not driver's licenses) fails to persuade us that the computerized search in this case returned results that ought to have been considered "ambiguous" by Officer Farrell.

*he stopped the defendant for questioning* was by no means limited to the results of the computerized search. The decision to stop Sholola for questioning was based on Farrell's first-hand observations of the defendant: (1) when he entered the Bank, looking disheveled in appearance, and was not familiar to Farrell as a regular customer; (2) when he used the bogus driver's license to obtain a large cash advance from the teller; and (3) when, *following* the dubious transaction, Sholola attempted to elude the uniformed Officer Farrell in the parking lot by "peek[ing] out" at him from "alongside of the pickup truck," walking briskly in the opposite direction, and initially failing to respond to the officer's call to stop. Considering the "*totality* of the circumstances," as viewed from the perspective of an experienced local law enforcement officer and experienced security officer at the Bank, we are firmly convinced that the decision to stop Sholola for questioning was supported by "*reasonable suspicion*" *of criminal activity* (i.e., theft by deception), as required by the Fourth Amendment. In light of the knowledge Officer Farrell had in his possession, including his personal observations of the suspect, further investigation was entirely proper because, as the Supreme Court noted in *Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1923 (1972):

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the *essence of good police work* to adopt an intermediate response. *A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer* at the time.

*Id.* (emphasis added); *see also Feliciano*, 45 F.3d at 1072 (observing that "it is much easier [for a police officer] to sit and just watch even the most suspicious conduct than it is to intervene before it becomes obvious to anyone that a crime is being committed.").

### 3. *The Arrest of the Defendant*

In addition to asserting that Officer Farrell lacked "reasonable suspicion" to stop him for questioning, Sholola maintains that there was not probable cause to arrest him. The trial court determined that the driver's license and credit card with corresponding information as to the identity of the owner were falsified documents and not the property of the defendant, and that this-combined with Sholola's previous suspicious behavior—was sufficient to establish probable cause.

It is axiomatic that "[a] warrantless arrest ... must be supported by probable cause." *United States v. Navarro*, 90 F.3d 1245, 1254 (7th Cir.1996) (citing *Michigan v. Summers*, 452 U.S. 692, 700, 101 S.Ct. 2587, 2593, 69 L.Ed.2d 340 (1981)). This Court recently summarized the parameters of the "probable cause" requirement, as follows:

> In order to make an arrest without a warrant, the police must have probable cause, under the *totality of the circumstances*, to reasonably believe that a particular individual has committed a crime.... While probable cause requires more than mere suspicion, *we do not require it to reach the level of virtual certainty.*

> In examining the conduct of investigating police officers, we have held that police officers have probable cause to make an arrest where *the facts and circumstances* within their knowledge and of which they have reasonably trustworthy information *are sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.*

*United States v. Gilbert*, 45 F.3d 1163, 1166 (7th Cir.1995) (citing, *inter alia, Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964)) (emphasis added).

The United States Supreme Court has consistently emphasized that "probable cause" is a "commonsense, non-technical conception[ ] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas*, —— U.S. at ——, 116 S.Ct. at 1661 (quoting *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983)). As previously noted,

the existence of probable cause is a "mixed question of law and fact" which, "as a general matter ... [is] reviewed *de novo* on appeal." *Id.* at ——, 116 S.Ct. at 1663. However, as the Supreme Court explained recently in its *Ornelas* decision, "a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that *deserve deference.*" *Id.* (emphasis added).

As noted above in our reasonable suspicion discussion, Officer Farrell was not only well-versed in law enforcement procedure, having been an officer in Orland Park for nine years, he had also been a security guard for eleven years, and a part-time guard at the Bank for some three years. The record also reflects that Sergeant Lynch, who conferred with Farrell prior to the defendant's arrest, was a sixteen-year veteran of the Orland Park Police Department. We agree with the trial judge that the facts and circumstances known to these experienced arresting officers gave them probable cause to believe that Sholola had committed the crime of theft by deception by proffering fraudulent documents in order to obtain cash from the Bank. As previously noted, the information known to Officer Farrell *prior* to stopping Sholola for questioning gave rise to a "reasonable suspicion" that the defendant had been engaged in criminal activity inside the Bank. What transformed this "reasonable suspicion" into probable cause was Sholola's inability to accurately respond to the questions of both Officer Farrell and Sergeant Lynch; specifically, his failure to provide truthful answers to correspond with the information on the driver's license he presented as his (date of birth, age, address, as well as the spelling of the "Alejandre" surname). Sholola's varied responses to the officers' queries were not only inconsistent with the information on the driver's license he presented, but inconsistent with each other as well. Indeed, the record reflects that his response to Sergeant Lynch's final question concerning his age was "drastically different" from the answer he had just given Lynch concerning his date of birth. These inaccurate and misleading responses to the officers' questions confirmed the officers' suspicion that neither the driver's license nor the credit card truly belonged to Sholola. We are convinced that at the time Sholola was placed under arrest, "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a *prudent man* in believing" that the suspect *had committed* or was committing *an offense*, specifically, the crime of using false documents in order to fleece the Bank out of $1,900 in cash. *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964)) (emphasis added).

Finally, we disagree with the defendant-appellant's claim that *United States v. Robinson*, 30 F.3d 774 (7th Cir.1994), is "on point" or that it compels a holding that the Orland Park Police lacked probable cause to arrest him. *Robinson* did involve, *inter alia*, the use of an assumed name by a suspect, and the giving of false information to police officers. But the similarities end there. One of the two co-defendants in *Robinson*, Brian S. Beal, was approached by police, identified himself as Vincent Townsend, and stated his date of birth as October 7, 1966. A consensual search of Beal's person revealed an Illinois traffic ticket, issued to a Vincent Townsend, that listed his date of birth as August 8, 1965. When Beal was again asked his birthdate and he once again provided an answer that failed to correspond with the information on the traffic ticket (issued under the name he claimed as his own, i.e., Vincent Townsend), he was temporarily detained while officers conducted further investigation (Beal was not placed under *arrest* until after investigating officers discovered marijuana on his person). Upon being detained, Beal claimed that he was not Vincent Townsend but Jarrell Townsend. We held that Beal's "misleading answers" and "less than truthful" responses concerning his birthdate, age, and name, in conjunction with other information known to the officers at that time, gave rise to a "reasonable suspicion" that justified an investigative detention or *Terry* stop of the defendant Beal while officers conducted further investigation at the scene. *Id.* at 784. Unlike the instant

case, *Robinson* did not involve a suspect who was observed by a police officer in the commission of a crime (obtaining $1,900 cash by using false documentation, i.e., credit card fraud). Furthermore, it is important to note that in *Robinson* we only discussed the legal significance of Beal's "misleading answers" (about his age) as they related to the issue of "reasonable suspicion." We had no occasion to (and did not) address the issue of whether Beal's conduct, in the context of all the facts and circumstances, would have given the officers "probable cause" to arrest him *at the point in time at which he provided birthdates* that failed correspond with the information on the traffic ticket.

### 4. The Search of the Defendant's Automobile

■ The defendant Sholola's third challenge to the district court's denial of his suppression motion relates to the search of the maroon Acura, which occurred immediately after his arrest.[14] As set forth above, the search of this vehicle revealed not only evidence that confirmed the defendant's involvement with credit card fraud, but also items that ultimately led to the discovery of his illegal heroin-importation scheme. Sholola argues that even if his arrest was lawful (as we have held), the search of the automobile cannot be justified under the "search incident to arrest" exception to the warrant requirement. We disagree.

In *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the Supreme Court elaborated upon the principle that "a warrantless search incident to a lawful arrest" is often justified by a legitimate concern for the safety of investigating police officers and/or the need to prevent an arrestee from destroying evidence. The Court held that:

When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. *And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule.* A gun on a table or in a drawer in front of one who is arrested can be as dangerous as one concealed in the clothing of the person arrested. *There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"-construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.*

. . .

[T]hese justifications are absent where a search is remote in time or place from the arrest.

*Id.* at 763, 89 S.Ct. at 2040 (emphasis added).

The Supreme Court in *New York v. Belton* was called upon to apply the principles it had previously set forth in *Chimel* to the frequently litigated "question of the proper scope of a search of *the interior of an automobile* incident to a lawful custodial arrest of its occupant[s]." 453 U.S. 454, 459, 101 S.Ct. 2860, 2863, 69 L.Ed.2d 768 (1981) (emphasis added). In *Belton*, the Court recognized the need for "[a] single, familiar standard . . . to guide police officers, who have only limited time and expertise to reflect on and balance

---

**14.** A "person[ ] present in [a] stolen car [does] not have a reasonable expectation of privacy in [the] car[ ]" and thus lacks standing to challenge a search of the vehicle on Fourth Amendment grounds. *United States v. Garcia*, 897 F.2d 1413, 1417 (7th Cir.1990). On the other hand, a defendant may challenge an automobile search on Fourth Amendment grounds even if he does not own or have a property interest therein. *Id.*; *see also United States v. Griffin*, 729 F.2d 475, 483 n. 11 (7th Cir.), *cert. denied*, 469 U.S. 830, 105 S.Ct.

117, 83 L.Ed.2d 60 (1984) (record reflected that defendants were using vehicle with the permission of one of the defendants' close relatives); *see also United States v. Posey*, 663 F.2d 37, 41 (7th Cir.1981). The record before us does not disclose how Sholola came to be in possession of the Acura, i.e., whether it was stolen or used with or without permission. We will assume, for purposes of our analysis, that the defendant had a legitimate expectation of privacy in the Acura, and thus has standing to challenge the search.

the social and individual interests involved in the specific circumstances they confront." *Id.* at 458, 101 S.Ct. at 2863. Accordingly, the Court announced a straightforward rule that *"when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the [interior] of that automobile,"* as well as any containers found therein. *Id.* at 460, 101 S.Ct. at 2864 (emphasis added). The Court reasoned that "articles inside ... of an automobile are in fact generally, if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon or evidentiary ite[m].'" *Id.* (quoting *Chimel,* 395 U.S. at 763, 89 S.Ct. at 2040). The Supreme Court has since emphasized that the "bright line" rule in *Belton* "authorizes [an automobile] search *whenever officers effect a custodial arrest,*" in part because the need to preserve evidence "justifies an *'automatic'* search." *Michigan v. Long,* 463 U.S. 1032, 1050, 103 S.Ct. 3469, 3481 n. 14, 77 L.Ed.2d 1201 (1983) (emphasis added).

■■■ Initially, we address the parties' incorrect assumption that this case somehow falls *outside* the scope of the rule announced in *Belton.* The Government, for reasons unexplained, states in its brief that *"Belton* is not directly applicable to this case." The appellant also argues that *Belton* is inapplicable, presumably because he was not technically an "occupant" of the vehicle immediately prior to the search, and cites our decision in *United States v. Adams,* 26 F.3d 702 (7th Cir.1994). Sholola's reliance on *Adams* is not persuasive, for in that case we held that an automobile search fell outside the scope of *Belton* because the defendant "was neither an occupant of the searched vehicle *nor positively linked to it prior to his arrest." Id.* at 705 (emphasis added). Sholola, by contrast, was "positively linked" to the maroon Acura, for during the initial discussion with Officer Farrell he pointed to the vehicle, opened the front driver's side door with a set of car keys in his hand, and stated, "See, it's my car." Obviously, Sholola's words and conduct conveyed that the vehicle was his (or at least

under his dominion and control). Because Sholola, unlike Adams, was "positively linked" to the searched vehicle prior to his arrest, we hold that *Belton is* applicable and that the officers were justified in searching the Acura incident to the lawful arrest of Sholola.

Our holding that this case is governed by the rule in *Belton* obviates the need for a detailed analysis of whether the search of the Acura could be justified under the rationale of *Chimel* (i.e., whether the search was permissible because Sholola was within "grabbing distance" of the interior of the vehicle at the time of his arrest). When an automobile is searched contemporaneously with the lawful arrest of the vehicle's occupant (or, in this case, an individual "positively linked" to the vehicle):

> The rule [in *Belton*] ... does not require the arresting officer to undergo a detailed analysis, at the time of arrest, of whether the arrestee, handcuffed or not, could reach into the car to seize some item within it, either as a weapon or to destroy evidence, or for some altogether different reason.... The law simply does not require the arresting officer to mentally sift through all these possibilities during an arrest, before deciding whether he may lawfully search the vehicle.

*United States v. Karlin,* 852 F.2d 968, 971 (7th Cir.1988), *cert. denied,* 489 U.S. 1021, 109 S.Ct. 1142, 103 L.Ed.2d 202 (1989) (quoting *United States v. Cotton,* 751 F.2d 1146, 1148 (10th Cir.1985)); *see also Adams,* 26 F.3d at 705; *Belton,* 453 U.S. at 460, 101 S.Ct. at 2864.

Sholola argues that the concerns for officer safety and preserving evidence which underlie *Chimel* and *Belton* do not apply to his case, because "[a]t the time the officers conducted their search of the vehicle, [he] was handcuffed and in the rear of a locked squad car from which he could not exit." We have consistently rejected this argument, as have other circuits,[15] because we recognize that very often "in instances where occupants of a car are arrested, they will be outside the car and will have been placed under some mea-

---

**15.** *See, e.g., United States v. White,* 871 F.2d 41 (6th Cir.1989); *United States v. Cotton,* 751 F.2d 1146 (10th Cir.1985); *United States v. McCrady,* 774 F.2d 868 (8th Cir.1985).

sure of security before the car is searched." *Karlin*, 852 F.2d at 971; *see also United States v. Willis*, 37 F.3d 313 (7th Cir.1994); *United States v. Arango*, 879 F.2d 1501 (7th Cir.1989), *cert. denied*, 493 U.S. 1069, 110 S.Ct. 1111, 107 L.Ed.2d 1019 (1990). Sholola has offered no compelling reasons for abandoning our clear precedent in this area, which holds that "officers may conduct valid searches incident to arrest *even when the officers have secured the suspect[ ] in a squad car and rendered [him] unable to reach any weapon or destroy evidence.*" *Willis*, 37 F.3d at 317 (emphasis added).

■ In concluding our Fourth Amendment analysis of the automobile search, we note that although the Government has chosen to characterize this search as a "search incident to arrest," it was also valid as a routine post-arrest "inventory search," of the kind approved by the Supreme Court in *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), and its progeny. Inventory searches "are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987). The Supreme Court, "[i]n applying the reasonableness standard adopted by the Framers ... has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody *where the process is aimed at securing or protecting the car and its contents.*" *Opperman*, 428 U.S. at 373, 96 S.Ct. at 3099 (emphasis added). Such searches have been upheld because they serve important, non-investigatory interests that include: (1) protecting the owner's property after arrest; (2) protecting the police against claims or disputes over lost or stolen property; and (3) protecting police from potential danger. *Id.* at 369, 96 S.Ct. at 3097; *see also United States v. Griffin*, 729 F.2d 475, 481 (7th Cir.), *cert. denied*, 469 U.S. 830, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984). Thus:

> [An] inventory search is constitutionally permissible if (1) the individual whose [vehicle] is to be searched has been lawfully arrested, and (2) the search satisfies the Fourth Amendment standard of reasonableness, i.e., it is conducted as part of the routine procedure incident to incarcerating an arrested person and in accordance with established inventory procedures.

*United States v. Velarde*, 903 F.2d 1163, 1165 (7th Cir.1990) (citation omitted).

Following the *lawful* arrest of Sholola, Sergeant Lynch and Officer Farrell jointly conducted the search of the Acura, with Farrell searching the driver's side and Lynch the passenger side of the vehicle. The items recovered in the search were placed in a bag, conveyed to the police station in police 'custody, inventoried, and reviewed later that evening by Secret Service Agent Oliphant as part of his investigation into the defendant's credit card fraud. With respect to this evidence, there was no break in the chain of custody. Consistent with *Belton* and *Opperman*, discussed *supra*, we are convinced that the search after arrest and/or inventory procedure in this case were both proper and in no way violated the defendant's rights under the Fourth Amendment.

### 5. *The Search of the Defendant's Storage Locker*

■ As noted in the background section of this opinion, the Orland Park Police arrested Sholola on a state charge of theft by deception (credit card fraud) and detained him in their lock-up facility for thirty-nine and one-half hours prior to bringing him before a judicial officer for a determination of probable cause as to the theft by deception charge. It was during this period (after approximately twenty-four hours) that Sholola gave his written consent to a search of the storage locker, which federal investigators believed would provide further clues as to Sholola's involvement in "a larger credit card scheme" (i.e., more extensive than the single transaction at the Bank). When searched, the storage locker contained heroin and papers relating to other mailboxes that the defendant had rented as part of his heroin-importation scheme (when those mailboxes were later searched, pursuant to warrants, investigators discovered fifteen envelopes containing shipments of heroin from India).

We understand Sholola to make a two-part argument concerning the storage-locker

search: (1) that his consent to the search was the "fruit" of an unlawful detention under the Supreme Court's decision in *Riverside*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49; *and* (2) that the proper remedy for this alleged *Riverside* violation is suppression of the evidence obtained as a result of the search.[16] The district court found that the defendant had failed to meet his burden of establishing a *Riverside* violation; thus, it did not reach the question of whether suppression was a proper remedy.

The Fourth Amendment, as the Supreme Court explained in *Gerstein v. Pugh*, requires that a "fair and reliable" determination of probable cause be made by a judicial officer "either before or promptly after arrest." 420 U.S. 103, 124–25, 95 S.Ct. 854, 868–69, 43 L.Ed.2d 54 (1975). However, in *Riverside*, the Supreme Court stated that "*a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of Gerstein.*" 500 U.S. at 56, 111 S.Ct. at 1670 (emphasis added). Under *Riverside*, detentions of forty-eight hours or less (such as Sholola's) are thus presumptively reasonable, and the presumption of validity can only be overcome:

> if the arrested individual can prove that his or her probable cause hearing was delayed unreasonably. Examples of un-

reasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake.

*Id.* (emphasis added).[17] Even if we were to assume there was a "delay" in bringing Sholola before a judicial officer,[18] however, the defendant's case falls within the forty-eight hour limit for presumptively reasonable searches, which means that Sholola has the burden of showing that such delay was unreasonable, i.e., that it was for the purpose of gathering additional evidence to justify the arrest, that it was motivated by ill will, or that it was "delay for delay's sake." *Id.* Because Sholola has failed to meet this burden, we hold that there was no *Riverside* violation.

■ The defendant has not demonstrated that he was detained beyond the morning of July 12 for any of the improper purposes identified in the *Riverside* decision. Most importantly, we emphasize that Sholola was not detained in order that investigators could "gather[ ] additional evidence *to justify his arrest.*" We are convinced that at the time Sholola was booked, the Orland Park Police *already* had sufficient evidence to support a charge of theft by deception and thus sufficient evidence to warrant his detention (i.e., the $1,900 credit card fraud offense commit-

---

16. The defendant-appellant has not challenged the district court's specific factual finding that Sholola's consent to the storage-locker search was voluntary and consensual, observing that there was *"no* evidence that [Sholola's consent] was *not* freely given." Rather, Sholola relies on the argument that his consent was tainted by an alleged *Riverside* violation.

17. *Riverside* also emphasized that "[i]n evaluating whether the delay *in a particular case* is unreasonable ... courts must allow a *substantial degree of flexibility." Id.* (emphasis added); *see also Bostic v. City of Chicago*, 981 F.2d 965, 968 (7th Cir.1992).

18. Illinois law does provide generally that "[a] person arrested with or without a warrant shall be taken without unnecessary delay before the nearest and most accessible judge in that county," 725 ILCS 5/109–1(a), but this provision of the Illinois Code of Criminal Procedure merely reflects the holding of *Riverside* and does not define the term "without unnecessary delay," much less require that every person arrested in the State of Illinois be brought before a judge on

the morning immediately following his arrest. Sholola has introduced no evidence of an official policy on the part of the Orland Park Police Department to this effect. His case is therefore distinguishable from that of the § 1983 plaintiff in *Willis v. City of Chicago*, who introduced evidence that the Chicago Police Department ("CPD"). had a *written* policy requiring (with some exceptions) that arrestees be brought "to the first available court call after completion of processing." 999 F.2d 284, 286 (7th Cir.1993). To support his argument that the Orland Park Police Department had a similar (albeit unofficial) policy, Sholola relies upon the testimony of Officer Swearingen, who testified that most of the suspects *he* has arrested during his one year on the force had been brought before a judicial officer on the morning following the arrest. However, because Officer Swearingen had only been a policeman in Orland Park for a relatively short time, his testimony can only be considered, at best, unconvincing evidence of a departmental policy.

ted at the Bank).[19] The investigation or evidence-gathering that took place subsequent to Sholola's arrest related to *other*, separate crimes (initially, financial fraud that might confer federal jurisdiction and-following the discovery of heroin in the storage locker—his involvement in narcotics trafficking).

Sholola's case resembles *United States v. Daniels*, 64 F.3d 311 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 745, 133 L.Ed.2d 693 (1996). Like the instant case, *Daniels* was a direct criminal appeal implicating *Riverside* issues. In *Daniels*, the defendant argued that his conviction for bank robbery ought to be reversed on the basis that he was detained for forty hours without a hearing. According to the defendant in *Daniels*, his detention was unreasonable within the meaning of *Riverside* because officers continued to investigate the robbery crime for which he had been arrested during the forty-hour time frame in which he was detained without a probable cause hearing. We rejected this argument as "ludicrous" for the same reasons we reject Sholola's claim today that a *Riverside* violation occurred: because the length of the detention was less than forty-eight hours and because the police had sufficient evidence to justify the defendant's arrest prior to conducting any further investigation. As Judge Bauer explained in *Daniels*:

> [The defendant's] argument seems to interpret *Riverside* to preclude law enforcement from bolstering its case against a defendant while he awaits his *Gerstein* hearing; that is a ludicrous position. *Gerstein* and its progeny simply prohibit law enforcement from detaining a defendant *to gather evidence to justify his arrest*, which is a wholly different matter. Probable cause to arrest *Daniels* already existed.... We therefore reject *Daniels*' contention that he did not receive a prompt *Gerstein* hearing.

*Id.* at 314 (emphasis added). Under the clear and straightforward logic of our decision in *Daniels*, police may conduct further investigation of a crime to "bolster" the case against a defendant while the defendant remains in custody, and they may likewise hold an individual while investigating *other* crimes that he may have committed, *so long as they have sufficient evidence to justify holding the individual in custody in the first place.*

In challenging his detention as unreasonable, Sholola relies primarily upon this Court's decision in *Willis*, 999 F.2d 284, a § 1983 civil rights action in which we held that the CPD had violated Willis' Fourth Amendment rights by detaining him for forty-five hours (well beyond the usual time for a probable cause hearing in that jurisdiction) solely in order that they might place him in lineups relating to other uncharged crimes. Sholola argues that the delay in bringing him before a judicial officer was unreasonable because the police, as in *Willis*, used an arrest "yet to be judicially scrutinized ... as an opportunity to build a separate case against [him]." *Id.* at 289. *Willis* is distinguishable, for there was firm evidence that the CPD—unlike the Orland Park Police Department—had an official, written policy of scheduling court appearances as soon as possible following arrest. Furthermore, the CPD *conceded that it had detained Willis solely for the purpose of using his physical presence to further investigate other crimes (i.e., by placing him in line-ups). Id.* at 288. By contrast, there is no evidence in this record that on the night of July 11 the Orland Park Police and Agent Oliphant even *discussed* the timing of Sholola's probable cause hearing, much less that they agreed to delay the hearing in order to allow for investigation of other crimes. Agent Oliphant stated that he was unfamiliar with any policies or procedures regarding the timing of probable cause hearings in the Illinois criminal justice system, and, contrary to Sholola's assertions in his brief, Oliphant specifically *denied* speaking with anyone on the evening of Sholola's arrest concerning when the defendant would appear before a judicial officer for such a hearing. This case is further distinguishable from *Willis* in that the appel-

---

**19.** This evidence included the false credit card and driver's license used in the transaction, the cash and accompanying receipt obtained by Sho-

lola, and eyewitnesses to the fraudulent transaction.

lant has failed to establish that the *purpose* for detaining him beyond the morning of July 12 was to obtain his consent for the storage locker search. In fact, Agent Oliphant testified that he had originally planned to obtain a search warrant for the locker, and had discussed this possibility with an Assistant State's Attorney, and he only abandoned this plan because Detective Kenealy suggested that they attempt to obtain the defendant's voluntary, written consent in lieu of a warrant.

The facts surrounding Sholola's detention bring to mind the recent case of *United States v. Stowe*, 100 F.3d 494 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997), in which the defendant was also held without a hearing for a period less than forty-eight hours and later argued that his confession (given during that period) should be excluded from evidence on *Riverside* grounds. We rejected that argument, observing that Stowe was not originally arrested on federal charges, but rather was detained for thirty-six hours on state charges, and that "no evidence exists whatsoever of an 'improper collaboration between federal and state or local officers'" with respect to the detention. *Id.* at 501 (quoting *United States v. Alvarez–Sanchez*, 511 U.S. 350, 359, 114 S.Ct. 1599, 1604, 128 L.Ed.2d 319 (1994)). Similarly, the defendant Sholola has not pointed out any testimony in the record that would support a theory of "improper collaboration" between Agent Oliphant and the Orland Park Police.

Finally, we note that most of the cases relied upon by Sholola (including *Willis* and *Riverside* itself) were civil rights actions brought pursuant to § 1983 and *not* criminal appeals, like the one before us, in which the defendant seeks to exclude evidence on the basis of an alleged *Riverside* violation.[20] The Government argues that a § 1983 civil rights action, and not suppression of the evidence,

is the proper remedy in cases where law enforcement officers have allegedly violated *Riverside*'s prompt presentment requirement. In *Powell v. Nevada*, the Supreme Court specifically declined to reach this issue, stating that "[w]hether a suppression remedy applies . . . remains an unresolved question." 511 U.S. 79, 85, n. *, 114 S.Ct. 1280, 1284 n. *, 128 L.Ed.2d 1 (1994). In light of our holding that Sholola has failed to meet his burden of establishing a *Riverside* violation, we reserve the remedy issue for another day.

## IV. CONCLUSION

A series of "steps" led the officers to the incriminating evidence of Sholola's conspiracy to import heroin from India, i.e., the initial decision to stop him for questioning (in light of Officer Farrell's observations about him before, during, and immediately after the fraudulent transaction inside the Bank), his lawful arrest for the crime of theft by deception, the search of the automobile incident to that arrest, and finally the consensual search of the storage locker. We have reviewed the record concerning each of these events, keeping in mind the Supreme Court's recent admonition that we "review findings of historical fact only for clear error and . . . give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas,* —— U.S. at ——, 116 S.Ct. at 1663. Our independent review, guided by relevant case law from the Supreme Court and this Circuit, persuades us that the actions of the various law enforcement officers in this case fell far short of violating, in any way, Sholola's Fourth Amendment right to be free from unreasonable searches or seizures. Accordingly, the district court's denial of Sholola's motion to suppress the evidence is

AFFIRMED.

---

**20.** The appellant has not cited (nor are we aware of) any federal circuit court opinions that lend credence to his position that suppression is the proper remedy in *Riverside* cases. Sholola cites but three district court opinions in support of this proposition. We need not discuss the district court's decision in *United States v. Clarke*, 925 F.Supp. 1433, 1452 (W.D.Mo.1996), which was recently overturned by the Eighth Circuit.

*See* 110 F.3d 612 (8th Cir.1997). Both *United States v. Leal,* 876 F.Supp. 190 (C.D.Ill.1995), and *United States v. Onyema,* 766 F.Supp. 76 (E.D.N.Y.1991), are distinguishable, *inter alia,* because the defendants therein were detained for periods considerably in excess of *Riverside*'s 48–hour outer boundary for presumptively reasonable detentions (72 and 78 hours, respectively).

DIANE P. WOOD, Circuit Judge, concurring.

I concur in the judgment of the court and with most of the analysis provided in the thorough majority opinion. Nonetheless, I consider it important to emphasize the standard of review that we are applying here, and I also have a different view of the way we should analyze some of Mr. Sholola's claims.

My additional remarks can be brief. First, as the majority indicates both when it describes the applicable standard of review for Sholola's Fourth Amendment claims and at the conclusion of the opinion, we are required under *Ornelas v. United States*, —— U.S. ——, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), to conduct a *de novo* review of the district court's determination of reasonable suspicion and probable cause to search. *Id.* at ——, 116 S.Ct. at 1663. In so doing, we must give "due weight" to the inferences drawn from the facts by the district court and by local law enforcement officials. "Due weight," however, must mean less deference than a "firm and definite conviction that an error has been made," for the latter phrase describes the clearly erroneous standard of review that the Supreme Court explicitly rejected for these questions in *Ornelas*. The majority recognizes all this, but I am concerned that its statement that we must give "special deference" to the district court's findings can lead to confusion. I find it hard to equate "special deference" with "due weight." To the contrary, it seems to me that the Supreme Court deliberately chose a formulation that allows the court of appeals to give deference where that is due, but to reject deference where its independent review suggests it is not due. The very meaning of "*de novo*" review is that the appellate court approaches its task from a clean slate, basing its ruling on the record that has been developed, but drawing its own conclusion on this particular mixed question of law and fact. In the end, I believe that the result the majority reaches does not conflict with these rules, but this is an area where the court must take special care with the language it uses, lest we be found to have disregarded the Supreme Court's very recent instructions to us.

My disagreements with the way in which the majority has applied the relevant law to the facts of this case similarly reflect a concern with the fine tuning of the opinion, not its broad conclusions. First, I think the majority has not been as careful as it should be with the evidence on which it relies to uphold Officer Farrell's initial decision to stop Sholola in the parking lot of the garden supply store. It summarizes that evidence on pages 813–814 of the opinion as follows:

> The decision to stop Sholola for questioning was based on Farrell's first-hand observations of the defendant (1) when he entered the Bank, looking disheveled in appearance, and was not familiar to Farrell as a regular customer, (2) when he used the bogus driver's license to obtain a large cash advance from the teller, and (3) when, *following* the dubious transaction, Sholola attempted to elude the uniformed Officer Farrell in the parking lot by "peek[ing] out" at him from "alongside of the pickup truck," walking briskly in the opposite direction, and initially failing to respond to the officer's call to stop.

(Emphasis in original.) Points (1) and (3) are unobjectionable: they clearly describe facts known to Officer Farrell at the time he made his decision to stop Sholola for preliminary questioning. Point (2), however, implies that Officer Farrell already knew that Sholola's driver's license was bogus. As the earlier description of the facts shows, this is not true. The most we can say is that Officer Farrell knew that there was a good chance that the driver's license was bogus, because he already knew that the California Department of Motor Vehicles (CDMV) had no record of any such license. I agree with the majority that the mere fact that there might have been some innocent explanation of this fact was not enough to render it irrelevant for Officer Farrell's purposes; in most states, driver's license records are entered very promptly into computer systems, and Officer Farrell was entitled to treat this piece of information as something tending to show that Sholola's license might have been

bogus. I note, in this connection, that the additional fact mentioned by the majority to the effect that the CDMV still had no record of the "Alejandre" license immediately before the evidentiary hearing is utterly beside the point. There is no way Officer Farrell could have known that fact, six months before it occurred, and thus no way he could have relied upon it when he decided to stop Sholola. In the final analysis, however, I agree that the totality of the circumstances supported Officer Farrell's decision to stop Sholola for questioning.

Second, I agree with the majority that Officer Farrell had probable cause to arrest Sholola by the time he did so, and that the warrantless search of Sholola's Honda Acura was a valid search incident to an arrest. We must be careful, however, not to extend *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), too far beyond its facts. In *Belton*, the Supreme Court held that the police may lawfully search an automobile when they have made a lawful custodial arrest of its occupant. *Id.* at 460, 101 S.Ct. at 2864. This court rephrased that rule in *United States v. Adams*, 26 F.3d 702 (7th Cir.1994), when it found a search outside the scope of *Belton* under circumstances in which the defendant was "neither an occupant of the searched vehicle nor positively linked to it prior to his arrest." *Id.* at 705. The majority's use of the "positive link" language from *Adams* could, I fear, be misunderstood in a future case, if it is not confined to the factual circumstances of this case.

The "positive link" required must, in keeping with *Belton*, be one that requires physical proximity that is the equivalent of occupancy of the automobile. Here, of course, that is true. Sholola himself went to his car, unlocked it with his own keys, opened the door, and stood there. One more step would have made him a literal "occupant" of the car. That kind of positive link fits easily within both *Belton* and *Adams*, and on that understanding I agree with the outcome here. Other "positive links" would plainly fall outside the scope of *Belton*. For example, the police could observe a suspect parking a car in an off-street legal parking lot, and then walking two blocks away from it, keeping both vehicle and suspect under constant surveillance. If they then arrested the suspect, in my view they would need something other than *Belton* to justify a search of the car, even though a "positive link" might be said to exist. Or the police could find a certificate of title to an automobile on the person of a suspect whom they had subjected to a lawful search incident to an arrest, positively linking the person to the car, even though it was parked halfway across town. Again, even if a search of that car might be justified on some other theory (including, obviously, pursuant to a warrant), *Belton* would be of no help.

Last, I am concerned that some of the majority's discussion of *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), could be misconstrued. Sholola's key argument here is that the Orland Park Police, working cooperatively with the Secret Service, detained him an extra day for the sole purpose of developing evidence about a crime for which he had not yet been charged. Under this court's decision in *Willis v. City of Chicago*, 999 F.2d 284, 289 (7th Cir.1993), such a course of conduct would violate the defendant's Fourth Amendment rights. Even though, in the language of *Riverside*, it would not amount to delay for the purpose of gathering additional evidence to justify the initial arrest, nor would it be delay motivated by ill will, it would be a special case of delay for delay's sake: buying time for the investigation of the *second* crime by dragging one's feet in bringing the defendant before a judicial officer to test the legality of the first detention. In keeping with our decision in *Willis*, I believe that such a course of conduct would be unlawful. I therefore regard the majority's statement at 820–821 that the police may always hold an individual "while investigating *other* crimes that he may have committed, *so long as they have sufficient evidence to justify holding the individual in custody in the first place*," (emphasis in original), as inconsistent with the holding of *Willis*.

Nevertheless, the majority goes on to show why *Willis* is easily distinguishable from this case, and by so doing, makes it clear that the overbroad statement quoted above is dicta. In *Willis*, the Chicago Police Department

conceded that it was detaining Willis for the purpose of using him to investigate other crimes, whereas in our case, the evidence showed that the relevant officers had no such intent. Because Sholola's hearing took place within 48 hours, it was his burden to show that the delay was unreasonable. This included the burden of proving that there was some substance to his suspicions about Agent Oliphant's role in the timing of his probable cause hearing. As the majority indicates, Sholola did not persuade the district judge that his account was true, and he has shown this court no reason why we should disturb the district court's conclusion. I therefore agree that there was no *Riverside* violation here, and thus no reason to exclude the evidence on the drug charges that was collected during the critical time period (as well as its fruits).

For these reasons, I concur in the judgment of the court.